2001 WY 23

**SCHERER CONSTRUCTION, LLC, a Wyoming limited liability company, Appellant (Defendant),**

v.

**HEDQUIST CONSTRUCTION, INC., a Wyoming corporation, Appellee (Plaintiff).**

**Hedquist Construction, Inc., a Wyoming corporation, Appellant (Defendant),**

v.

**Scherer Construction, LLC, a Wyoming limited liability company, Appellee (Plaintiff).**

**Nos. 00–106, 00–107.**

Supreme Court of Wyoming.

March 1, 2001.

Representing Scherer Construction, LLC: Mark W. Gifford, Casper, WY. Argument by Mr. Gifford.

Representing Hedquist Construction, Inc.: John H. Robinson, Casper, WY. Argument by Mr. Robinson.

Before LEHMAN, C.J., and THOMAS *, GOLDEN, HILL, and KITE, JJ.

HILL, Justice.

[¶ 1] These consolidated cases concern a dispute arising out of a subcontractor agreement. In case No. 00–106, the subcontractor, Scherer Construction, LLC, (Scherer) appeals the district court's grant of summary judgment on its claim for breach of contract including the implied covenant of good faith and fair dealing by the main contractor, Hedquist Construction, Inc. (Hedquist), in soliciting and obtaining a change order from the City of Casper. In Case No. 00–107, Hedquist appeals from the district court's determination that it had failed to fully compensate Scherer for work actually performed under the subcontract and denying Hedquist a set-off. We reverse that portion of the district court's decision in Case No. 00–106 relating to Scherer's claim for breach of the implied covenant of good faith and fair dealing. In Case No. 00–107, we conclude that the district court's findings and conclusions are not clearly erroneous and affirm.

[¶ 2] In Case No. 00–106, Scherer presents the following issue for consideration:

Did the trial court err in granting summary judgment in favor of [Hedquist] and against [Scherer] with respect to [Scherer's] claim for breach of contract, including its claim for breach of the implied covenant of good faith and fair dealing?

Hedquist responds with the following statement:

Whether the trial court committed reversible error in granting summary judgment

where the undisputed facts supported Hedquist's contention that no breach of contract had occurred, and where Scherer submitted no facts or evidence supporting a cause of action for breach of the implied covenant of good faith and fair dealing.

In Case No. 00–107, Hedquist presents a single issue for consideration:

Was the trial court's finding that Hedquist failed to give Scherer reasonable notice to repair its defective work, clearly erroneous or incorrect as a matter of law, considering the parties' unambiguous contract provisions regarding Scherer's duty to perform its work in a timely and workmanlike manner, and the undisputed evidence regarding numerous requests for Scherer to repair said defective work?

Scherer counters with a short statement of the issue in the form of a question:

Did the trial court commit clear error in awarding a judgment in favor of Scherer on its claim for amounts due for work performed on the Project?

## FACTS

### Case No. 00–106

[¶ 3] Pursuant to our standard of review for summary judgments, the recitation of facts is from the vantage point most beneficial to the party who opposed the motion, awarding that party all favorable inferences that may be drawn from those facts. *S & G Investors, LLC v. Blackley*, 994 P.2d 941, 943 (Wyo.2000).

[¶ 4] Hedquist was the main contractor for the City of Casper's East Second Street Reconstruction Project (the Project). Scherer was the successful bidder for the paving subcontract. The Project's specifications called for the use of "performance graded" asphalt, which was a special rubberized asphalt. Approximately $340,000.00 of Scherer's total $443,802.43 bid was related to the costs associated with the special rubberized asphalt. Pursuant to the requirements of the Project, Scherer expended in excess of $35,000.00 on special equipment and materials.

* Concurred prior to retirement.

[¶ 5] The contract between Hedquist and the City of Casper (the Main Contract) contained the following clauses:

6.11 All Work performed for [Hedquist] by a Subcontractor or Supplier will be pursuant to an appropriate agreement between [Hedquist] and the Subcontractor or Supplier which specifically binds the Subcontractor or Supplier to the applicable terms and conditions of the [Main Contract]....

....

10.1 Without invalidating the Agreement and without notice to any surety, [the City of Casper] may, at any time or from time to time, order additions, deletions or revisions in the Work. Such additions, deletions or revisions will be authorized by a Written Amendment, a Change Order, or a Work Change Directive. Upon receipt of any such document, [Hedquist] shall promptly proceed with the Work involved which will be performed under the applicable conditions of the Contract Documents (except as otherwise specifically provided).

The subcontract agreement between Hedquist and Scherer, which was entered into on April 8, 1998, contains parallel language:

In consideration therefore, the Subcontractor (Scherer) agrees as follows:

....

2. To be bound by the terms of said Main Contract with the [City of Casper] (including every part of and all the general and special conditions, drawings, specifications and addenda), in any way applicable to this Subcontract[.]

....

(d) HEDQUIST may, without invalidating the SUBCONTRACT, order extra work or make changes by altering, adding to, or deducting from the work; the price herein being adjusted accordingly. All such work shall be executed under the conditions hereof, and of the MAIN CONTRACT, except that any claim for extension of time caused thereby must be agreed upon at the time of ordering such change.

[¶ 6] At the start of the Project, the use of concrete instead of asphalt had not been considered because of the presumed higher costs associated with concrete. However, shortly before the paving phase of the Project was to commence, discussions regarding a possible switch to concrete took place between Hedquist, the City of Casper, and the Project Engineer. According to a representative of the City, Hedquist initiated the discussions. The parties concluded that concrete would not, in fact, be cost prohibitive. On June 3, 1998, Hedquist sent a letter to the Project Engineer detailing a cost comparison between concrete and asphalt. On the same day, the Project Engineer sent a letter to the City detailing Hedquist's proposal. In a June 12 letter, Hedquist stated that it felt "that the concrete paving alternate would be a positive partnering/value-engineering concept for this project."

[¶ 7] On June 19, 1998, the City Engineer and Public Services Director recommended the issuance of a change order pursuant to the Main Contract allowing the substitution of concrete for asphalt paving on the Project. A change order for the substitution was approved by the City on the same day. The net effect of the change from asphalt to concrete paving was to reduce the value of Scherer's subcontract from $448,240.45 to $105,093.81. In addition, the specialized materials and equipment Scherer had already purchased in anticipation of asphalt paving were rendered superfluous by the change.

[¶ 8] On July 10, 1998, Scherer filed this action against Hedquist. Among other causes of action not relevant to this appeal, Scherer claimed that Hedquist breached the subcontract and an implied covenant of good faith and fair dealing. In response, Hedquist moved for summary judgment. In opposition to Hedquist's motion, Scherer made three arguments in support of its action. First, Scherer contended, pursuant to § 205 of the Restatement (Second) of Contracts (1981), that there is an implied covenant of good faith and fair dealing in every contract. Scherer argued that Hedquist's active solicitation of the change order breached that implied covenant. Second, Scherer urged the adoption of the cardinal change doctrine, which recognizes that extraordinary changes can constitute a breach of contract despite

the presence of a changes clause. *See, e.g., Allied Materials & Equipment Company v. United States,* 215 Ct.Cl. 406, 569 F.2d 562 (1978). Finally, Scherer contended that summary judgment was inappropriate because Hedquist's motion was supported by a perjurious affidavit. Scherer alleged that the vice president of Hedquist's affidavit made untrue statements regarding Hedquist's role in soliciting the change order. Scherer concluded that the motion for summary judgment should be denied since it was largely based on the statements put forth in that affidavit.

[¶ 9] On July 21, 1999, the district court issued a decision letter granting Hedquist's motion for summary judgment based on the following conclusions:

[T]he Court would reject the defense's argument that the cardinal change doctrine be applied in this case as a basis for disregarding the legal obligations established by contract. It would not appear that the cardinal change doctrine has been adopted in the State of Wyoming, nor would such doctrine have application in this case where the claim is not being asserted against the government, and where the subject change order was implemented and directed by the City of Casper, and was contractually beyond the control and authority of Hedquist. [Citations omitted.]

Having rejected the application of the cardinal change doctrine to the situation presented in this case, the breach of contract claim must fail. The Subcontractor Agreement entered into by the parties reflects that there was an offer, acceptance, and consideration for the contract, and therefore this Court must conclude that there was a meeting of the minds and that an enforceable contract exists. *Frost Construction Company v. Lobo, Inc.,* 951 P.2d 390, 394 (Wyo.1998). Further, the Court must give effect to the clear intent of the parties to the Subcontractor Agreement since such intent is expressed therein in clear and unambiguous language. *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.* 929 P.2d 1228, 1233 (Wyo.1996). The clear and unambiguous language of the contract documents quoted herein establish that Scherer

agreed to be bound by the terms of both the Main Contract and the Subcontractor Agreement, and thereby agreed to the provisions allowing for change orders on the Project, including the provision that Hedquist could, without invalidating the Subcontract, make changes by altering, adding to, or deducting from the work subject to the agreement. . . .

Given the foregoing rulings finding a clear and unambiguous contractual relationship between the parties and the lack of any breach by Hedquist of the contractual duties imposed, it would not appear that the plaintiff's additional claims for recovery herein can be sustained. *Polo Ranch Company v. City of Cheyenne,* 969 P.2d 132, 136 (Wyo.1998).

In a footnote, the court disposed of the claim for a breach of the implied covenant of good faith and fair dealing by noting that such a claim "requires a rare and exceptional situation where there is a special relationship of trust and reliance to give rise to tort liability. *Terry v. Pioneer Press, Inc.,* 947 P.2d 273, 277 (Wyo.1997)." Scherer now appeals that decision to this Court.

### Case No. 00–107

[¶ 10] After the change order had substituted concrete for asphalt, Scherer was still obligated under the subcontract to perform work on the Project consisting of a few parking lots and "tie-ins" where side streets intersected with Second Street. Needless to say, the relationship between Scherer and Hedquist had become strained and, inevitably, a dispute arose between the parties regarding the quality of Scherer's work. In addition, the dispute was complicated by the unusual arrangement set forth in the agreement between the parties. Hedquist was required to prepare the base and subgrade, while Scherer's sole responsibility was for the asphalt paving. The usual course was for one party to assume responsibility for all of those tasks. Naturally, this arrangement contributed to the dispute over ultimate responsibility for substandard work.

[¶ 11] In March of 1999, Maxim Technologies reported test results of core samples taken at every asphalt tie-in section. The

results disclosed deficiencies with asphalt thickness and density. The parties disputed responsibility for the deficiencies. Hedquist insisted that it was the result of substandard paving work by Scherer, who countered that the problem lay with the base and subgrade put down by Hedquist. At a meeting on March 23, 1999, Hedquist demanded that Scherer repair the defects in its work, while Scherer requested an independent analysis to determine the cause of the deficiencies. Neither of these courses of action was ever undertaken.

[¶ 12] On June 10, 1999, the Project Engineer issued a "punch list" of requested repairs related to the asphalt paving. On June 30, Hedquist demanded that Scherer appear at the job site on July 6 ready to perform the repairs set out in the "punch list." Scherer demurred based on Hedquist's failure to pay for work already performed and on its belief that the "punch list" items were not valid. The next day Hedquist responded by noting that Scherer was not entitled to payment until after the contract work was completed and accepted. Hedquist also demanded that Scherer acknowledge by 5 p.m. that day that it would be ready to complete the "punch list" on the morning of July 6 or alternative arrangements would be made. In reply, Scherer declined to meet the "arbitrary" deadline propounded by Hedquist. At the time of Hedquist's demand on July 1, Scherer was involved in another project in Rawlins and unavailable to receive the ultimatum. Also, on the date for the proposed "punch list" repairs, Scherer was unavailable because of another project on Interstate 25 near Buffalo.

[¶ 13] Hedquist made good on its threat to find alternative arrangements and hired 71 Construction to do the "punch list" repairs. 71 Construction billed Hedquist $20,500.74 for the job. Hedquist deducted the amount paid to 71 Construction along with an additional $2,780.00 in paving costs that it had incurred from the amounts owed to Scherer. The total amount withheld from Scherer was $23,280.74.

[¶ 14] After the grant of the summary judgment motion at issue in Case No. 00–106, Scherer was allowed to amend its Complaint to assert a claim alleging a wrongful retention of payments owed by Hedquist. Hedquist filed a counterclaim alleging that it was entitled to a "set-off" based on additional costs incurred to repair Scherer's deficient work. The matter was heard in a trial before the district judge. On January 21, 2000, the district court judge issued Findings of Fact, Conclusions of Law, and Judgment in favor of Scherer. The district court judge concluded that Hedquist had failed to give Scherer reasonable time to make reparation under the parties' agreement. The court awarded Scherer the $23,280.74 that had been withheld and denied Hedquist's request for a set-off. Hedquist now appeals that decision.

## I. CASE NO. 00–106

### A. Standard of Review

[¶ 15] Our standards for reviewing a summary judgment are well established and often reiterated:

Summary judgment is appropriate when no genuine issue as to any material fact exists and the prevailing party is entitled to have a judgment as a matter of law. *Kahrs v. Board of Trustees for Platte County Sch. Dist. No. 1*, 901 P.2d 404, 406 (Wyo.1995); *see also* W.R.C.P. 56(c). A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense which has been asserted by the parties. *Adkins v. Lawson*, 892 P.2d 128, 130 (Wyo.1995). We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record. *Jack v. Enterprise Rent–A–Car Co. of Los Angeles*, 899 P.2d 891, 893 (Wyo.1995). We evaluate the propriety of a summary judgment by employing the same standards and by using the same materials as were employed and used by the lower court. *Adkins*, 892 P.2d at 130. We do not accord any deference to the district court's decisions on issues of law. *Kahrs*, 901 P.2d at 406.

*Bachmeier v. Hoffman,* 1 P.3d 1236, 1240 (Wyo.2000).

## B. *Discussion*

[¶ 16] The main issue raised by Scherer concerns the district court's summary judgment on its claim that Hedquist breached the implied covenant of good faith and fair dealing. The district court granted summary judgment on this claim on the grounds that Scherer had failed to establish the existence of a "special relationship" with Hedquist giving rise to tort liability. Scherer argues that the district court failed to distinguish between a contract-based and tort-based claim for the breach of an implied covenant of good faith and fair dealing. Scherer argues that since every contract contains an implied covenant of good faith, the district court erred in granting summary judgment solely on the basis of a tort-based theory.

[¶ 17] This Court has recognized a tort-based claim for breach of the implied covenant of good faith in limited circumstances. *McCullough v. Golden Rule Insurance Company,* 789 P.2d 855 (Wyo.1990) (insurance); *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211 (Wyo.1994) (employment). In employment cases, we have limited the tort to those situations where a "special relationship" exists between the employer and the employee.[1] *Worley v. Wyoming Bottling Company, Inc.,* 1 P.3d 615, 624 (Wyo.2000). The district court granted summary judgment in this case based on its determination that Scherer had failed to establish the existence of a special relationship with Hedquist. The district court clearly erred in granting the summary judgment on that basis alone. We have not extended the scope of permissible tort-based breach of the implied covenant of good faith claims beyond the insurance or employment context. *See Cowardin v. Finnerty,* 994 P.2d 335, 339 (Wyo.1999) (refusing to allow tort recovery for consequential damages arising from a failure to pay sums due under a contract); and *JBC of Wyoming Corporation v. City of Cheyenne,* 843 P.2d 1190, 1197 (Wyo.1992).

Therefore, the district court's decision to grant summary judgment against Scherer based on a tort theory was correct. However, the district court did not go far enough because Scherer's claim was also based in *contract.* We must now determine whether Wyoming law recognizes a claim for the breach of the implied covenant of good faith under a contract theory.

[¶ 18] The Montana Supreme Court summarized the history of the implied covenant of good faith in commercial contracts:

The concept of good faith and fair dealing has a venerable history in the law of commercial contracts. It first appears in classical Roman law and by the eighteenth century was a well established principle of English contract law imbuing commercial relationships with the common religious and moral principles of the time. E. Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code,* 30 U.Chi. L.Rev. 666, 669–70 (1962–63). In early twentieth century America, courts first implied the covenant in commercial contracts which, due to the imprecision of the business environment, required that some term be left to the discretion of one of the parties. The implied covenant prevented one party from taking advantage of that discretion to deprive the other of the benefit of the contract. *See e.g. Loudenback Fertilizer Co. v. Tennessee Phosphate Co.* (6th Cir.1903), 121 F. 298, 303 (holding that the manufacturer could not interpret "requirements" to purchase from the contract supplier only when the market price exceeded the contract price). Courts used the covenant as a "gap filler" to interpret agreements to cover situations not anticipated in the writing. *See e.g. Kirke La Shelle Co. v. Paul Armstrong Co.* (1933), 263 N.Y. 79, 188 N.E. 163, 168 (holding that under a contract entered prior to the advent of "talkies," rights to a screen play included rights to the motion picture). Use of the covenant became so common

*State Farm Mutual Automobile Insurance Company v. Shrader,* 882 P.2d 813, 825 (Wyo.1994) (citing *McCullough,* 789 P.2d 855, 858).

---

1. A special relationship is also an element of a tort-based claim in the insurance context, which automatically exists by virtue of the unequal bargaining power the insurer has over an insured.

that it was codified in the Uniform Commercial Code. See 1 R. Anderson, Uniform Commercial Code, § 1–201:82 (3rd ed.1981). In all cases, the remedy was the same; breach of the covenant or implied contract term was breach of the contract. *Story v. City of Bozeman,* 242 Mont. 436, 791 P.2d 767, 772–73 (1990). The Restatement (Second) of Contracts has taken the concept beyond the commercial context:

### § 205. Duty of Good Faith and Fair Dealing

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

### Comment:

*a. Meanings of "good faith."* Good faith is defined in Uniform Commercial Code § 1–201(19) as "honesty in fact in the conduct or transaction concerned." "In case of a merchant" Uniform Commercial Code § 2–103(1)(b) provides that good faith means "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness. The appropriate remedy for a breach of the duty of good faith also varies with the circumstances.

. . . .

*d. Good faith performance.* Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Restatement (Second) of Contracts, § 205 (1981); *see also* 13 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 38:15 (4th Ed.2000).

 [¶ 19] The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement. *Gilmore v. Duderstadt,* 125 N.M. 330, 961 P.2d 175, 182 (App.1998); *Andalex Resources, Inc. v. Myers,* 871 P.2d 1041, 1047 (Utah App.1994); *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 841 (S.D.1990). Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. *Andalex Resources, Inc.,* 871 P.2d at 1047; Restatement (Second) of Contracts § 205 cmt. a. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance. *Gilmore,* 961 P.2d at 182; Restatement (Second) of Contracts § 205 cmt. d. "The purpose, intentions, and expectations of the parties should be determined by considering the contract language *and* the course of dealings between and conduct of the parties." *Andalex Resources, Inc.,* 871 P.2d at 1047–48 (quoting *St. Benedict's Dev. v. St. Benedict's Hospital,* 811 P.2d 194, 200 (Utah 1991) (emphasis in original)). The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. *Andalex Resources, Inc.,* 871 P.2d at 1048 (citing *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991)). In other words, the concept of good faith and fair dealing is not a limitless one. "The implied obligation 'must arise from the language used or it must be indispensable to effectuate the intention of the parties.'" *Garrett v. BankWest, Inc.,* 459 N.W.2d 833 at 841 (S.D. 1990) (quoting *Sessions, Inc. v. Morton,* 491 F.2d 854, 857 (9th Cir.1974)). In the absence of evidence of self-dealing or breach of "com-

munity standards of decency, fairness or reasonableness," the exercise of contractual rights alone will not be considered a breach of the covenant. Restatement (Second) of Contracts § 205 cmt. a. "Whether there has been a breach of the covenant of good faith and fair dealing is a factual inquiry that focuses on the contract and what the parties agreed to." *Gilmore*, 961 P.2d at 182 (quoting *Bourgeous v. Horizon Healthcare Corporation*, 117 N.M. 434, 439, 872 P.2d 852, 857 (1994))[2].

[¶ 20] After reviewing our case history, it is clear that this Court has never specifically stated whether or not it will recognize a claim for breach of the covenant of good faith and fair dealing based on a contract theory. In several cases, a party attempted to raise a claim for breach of the implied covenant of good faith based on a contract theory, but the claim was inappropriate in light of the particular facts of the case. *See Husman v. Triton Coal Company*, 809 P.2d 796, 801 (Wyo.1991); and *Four Nines Gold, Inc. v. 71 Construction, Inc.*, 809 P.2d 236, 239 (Wyo. 1991). In *Four Nines Gold* we declined to address the claim for the simple reason that there was no contract. 809 P.2d at 239. It should almost go without saying that if there is no contract between the parties, then there can be no claim for a breach of an implied covenant of good faith based on a contract theory. In *Husman*, we declined to consider Husman's claim because it was based on an allegation of bad faith occurring prior to the entering of the contract where such behavior is more properly brought as a claim for fraud or negligent misrepresentation. 809 P.2d at 801–02; *See also* Restatement (Second) of Contracts § 205 cmt. c (This section does not

apply to conduct during the formation of a contract.).

[¶ 21] In several other cases, we have cited § 205 of the Restatement (Second) of Contracts, or the concept contained in it, with at least tacit approval even if the ultimate resolution of the case did not rely on it. The first is *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 220 (Wyo.1994). In *Wilder* we established a rule that an employee may have a tort cause of action for breach of the implied covenant of good faith and fair dealing against his employer if a special relationship exists. To that extent, it is not directly relevant to the issue before us in this case. However, in *Wilder* we cited, with evident approval, § 205 and comment a, which defines "good faith." *Id.*

[¶ 22] A somewhat different scenario unfolded in *State Farm Mutual Automobile Insurance Company v. Shrader*, 882 P.2d 813, 825 (Wyo.1994), where, after quoting § 205 of the Restatement (Second) of Contracts, the Court made the following statement:

> Wyoming has recognized that a breach of the implied covenant of good faith and fair dealing may be actionable in contract for compensatory damages.

The *Shrader* Court cites *Arnold v. Mountain West Farm Bureau Mutual Insurance Company, Inc.*, 707 P.2d 161, 164 (Wyo.1985) in support of that broad statement. Presumably, the Court in *Shrader* relied upon the following equally broad and unsupported statement from *Arnold*:

> Where one party breaches the contract in bad faith, the injured party can seek dam-

---

**2.** This is not to imply that summary judgment may not be an appropriate means for resolving these claims. A motion for summary judgment may be granted if, under the facts in the record, the party's actions alleged as the basis for the breach of the implied covenant were in conformity with the clear language of the contract. Our dictum that the interpretation and construction of a contract is a question of law and for the court to resolve in the first instance is still valid. *See Brockway v. Brockway*, 921 P.2d 1104, 1106 (Wyo.1996). If the action complained of is clearly within the intention of the parties as expressed within the unambiguous language of the contract, then summary judgment is appropriate. Conversely, a motion may be defeated by a dem-

onstration that a genuine issue of material fact exists as to whether the party's conduct involved self-dealing beyond the mere exercise of contract rights or in violation of the community standards of decency, fairness, or reasonableness. In making a ruling on summary judgment, the district court should consider the conduct alleged to constitute the breach within the context of the language of the contract, the course of conduct of the parties, and the standards and norms of the subject industry. The district court in this case did not have the opportunity to make its ruling based on the standards we have enunciated today. Therefore, our reversal is with instructions for the court to reconsider Hedquist's motion for summary judgment in light of our ruling.

ages for breach of the implied covenant of good faith.

*Arnold,* 707 P.2d at 164. While both of these statements are clearly dicta within the context that they appear in those cases, their presence does, at least, suggest a general acceptance of the concept. *See also Schuler v. Community First National Bank,* 999 P.2d 1303, 1305 (Wyo.2000) (Holding bank was within its rights to freeze line of credit and citing in support *Price v. Wells Fargo Bank,* 213 Cal.App.3d 465, 261 Cal.Rptr. 735, 742 (1989) (The implied covenant of good faith and fair dealing "does not impose any affirmative duty of moderation in the enforcement of legal rights.")).

[¶ 23] In response to Scherer's position, Hedquist cites our statement in *Loghry v. Unicover Corporation,* 927 P.2d 706, 711–12 (Wyo.1996):

> Wyoming does not recognize a cause of action for breach of the covenant of good faith and fair dealing under a contract theory.

This statement appears to be in direct conflict with our statements in *Arnold* and *Shrader.* In support of the statement, the *Loghry* opinion cites *Hatfield v. Rochelle Coal Company,* 813 P.2d 1308, 1310 (Wyo. 1991) and *Leithead v. American Colloid Company,* 721 P.2d 1059, 1064 (Wyo.1986). *Hatfield* was a wrongful termination action where this Court held that "under the current status of Wyoming law" it would decline to "recognize an implied covenant of good faith and fair dealing imposed upon an employer by virtue of his being a party to an employment contract." 813 P.2d at 1310. Similarly, *Leithead* was a wrongful termination suit where we declined to recognize the cause of action where the employee had an implied employment contract under which he could only be terminated for cause. 721 P.2d at 1064. Neither of these cases supports the broad implications of the statement in *Loghry.* Since these employees could only be terminated for *cause,* by definition they could only be terminated in "good faith" and, thus, there was no need to recognize an

implied covenant of good faith as it was already a specified term of the contract. In the at-will employment context, an employee may be terminated for any or no reason. *Wilder,* 868 P.2d at 217. The existence of a contractual implied covenant is obviously incompatible with the at-will presumption and is not applicable in those situations.[3] Accordingly, the statement in *Loghry* is correct as far as employment law is considered. The statement is also technically correct as far as commercial contracts are concerned in the sense that, as we have already noted, adoption or rejection of the implied covenant has not been explicitly ruled upon. We now proceed to consider that very issue.

▇▇▇ [¶ 24] In *Aztec Gas & Oil Corporation v. Roemer Oil Company,* 948 P.2d 902, 906 (Wyo.1997) (Thomas, J., dissenting), the dissent urged the adoption of § 205 of the Restatement (Second) of Contracts in light of our acknowledgment of it in *Shrader, Wilder,* and *Husman.* Today we explicitly adopt § 205 and hold that parties to a commercial contract may bring a claim for breach of the implied covenant of good faith and fair dealing based on a contract theory. The majority of jurisdictions recognize a duty to perform a contract in good faith. Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harvard L.Rev. 369 (1980); *Garrett,* 459 N.W.2d at 841; *Amoco Oil Company v. Ervin,* 908 P.2d 493, 498 (Colo.1995). Furthermore, a significant number of contracts in Wyoming already have a covenant of good faith imposed by statutory operation. All contracts coming under the ambit of the Uniform Commercial Code have an obligation of good faith imposed in performance or enforcement. Wyo.Stat.Ann. § 34.1–1–203 (LEXIS 1999). It would be incongruous to allow a significant portion of commercial contracts in this state to be governed by an implied covenant of good faith while denying the same to all others. Consistency counsels adopting § 205 of the Restatement (Second) of Contracts.

---

3. This assumes the existence of a contract of employment for an indefinite period. If there is no contract, then no claim for a breach of the

implied covenant can be made in any instance since the existence of a valid contract is the *sine qua non* of the claim.

[¶ 25] Our adoption of § 205 of the Restatement (Second) of Contracts means that we must reverse the district court's summary judgment on Scherer's claim for breach of the implied covenant of good faith and fair dealing and remand the matter for further proceedings consistent with our opinion.

[¶ 26] We turn now to Scherer's other claims. In their second issue, Scherer argues that the district court should have recognized the cardinal change doctrine. The doctrine has been described thusly:

> Under established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties material[ly] different from those originally bargained for. By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

*Allied Materials & Equipment Company, Inc.,* 569 F.2d at 563–64; *see also McDaniel v. Ashton–Mardian Company,* 357 F.2d 511 (9th Cir.1966); and *Peter Kiewit Sons' Company v. Summit Construction Company,* 422 F.2d 242 (8th Cir.1969). Scherer insists that the change from asphalt to concrete was a cardinal change. Scherer points to the significant reduction in the monetary value of its subcontract as evidence that the change was a cardinal one.

[¶ 27] In response, Hedquist argues that these cases apply the doctrine only against governmental entities, and it was the City of Casper that effectuated the change order, not Hedquist. We need not determine whether the cardinal change doctrine applies only to governmental entities. Cf. *Peter Kiewit ·Sons' Company,* 422 F.2d 242. It is indisputable that it was not Hedquist that issued the change order. Indeed, pursuant to the Main Contract, the only party that could make that change was the City of Casper. Every case cited by Scherer involves an action by one party to a contract against the party, usually a governmental entity but not exclusively so, that actually issued the change order. We decline to extend the doctrine to include third parties who happen to be parties to the contract.

[¶ 28] In its final issue, Scherer claims that Hedquist's motion for summary judgment was based on a perjurious affidavit. Since we have reversed the summary judgment on the issue of the implied covenant of good faith and fair dealing, we perceive this issue as moot because Scherer has received the relief requested. In addition, Scherer's complaint about the affidavit revolves around Hedquist's role in allegedly soliciting the change order. This appears to be a factual dispute that goes to the heart of Scherer's claim for breach of the implied covenant of good faith and, accordingly, it is an issue that will be resolved one way or the other on remand.

## II. CASE NO. 00–107

### A. Standard of Review

[¶ 29] The issue raised in this appeal is dependent upon a reading of the contract between the parties. In those cases we have stated:

> According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America,* 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. [*Union Pacific Resources Co. v. Texaco, Inc.,* 882 P.2d 212, 220 (Wyo. 1994); *Prudential Preferred Properties v. J and J Ventures, Inc.,* 859 P.2d 1267, 1271 (Wyo.1993).] In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.,* 929 P.2d 535, 539 (Wyo.1996); *Prudential Preferred Properties,* 859 P.2d at 1271.

*Amoco Production Company v. EM Nominee Partnership Company,* 2 P.3d 534, 540 (Wyo.2000).

[¶ 30] In addition, this matter was tried before the district court, which made findings of fact and conclusions of law.

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. *Hopper v. All Pet Animal Clinic, Inc.,* 861 P.2d 531, 538 (Wyo.1993). While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. *Id.* Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence. *Id.* Findings of fact will not be set aside unless the findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* *Stroup v. Oedekoven,* 995 P.2d 125, 128 (Wyo. 1999) (quoting *Springer v. Blue Cross and Blue Shield of Wyoming,* 944 P.2d 1173, 1175–76 (Wyo.1997)).

### B. *Discussion*

██ [¶ 31] Hedquist contends that it did not breach the contract when it withheld money from Scherer. Hedquist insists that it was entitled to withhold the money to cover the extra expenses incurred in repairing the defects to Scherer's work. In support of its position, Hedquist points to several provisions of the Main Contract including:

> 6.29 CONTRACTOR shall carry on the Work and adhere to the progress schedule during all disputes or disagreements with OWNER. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, except as permitted by paragraph 15.5 or as OWNER and CONTRACTOR may otherwise agree in writing.

> 6.30.1 CONTRACTOR warrants and guarantees to OWNER, ENGINEER and ENGINEER's Consultants that all Work will be in accordance with the Contract Documents and will not be *defective....*

> 6.30.2 CONTRACTOR's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute....

> ....

> 13.11 If required by ENGINEER, CONTRACTOR shall promptly, as directed, either correct all *defective* Work, whether or not fabricated, installed or completed, or, if the Work has been rejected by ENGINEER, remove it from the site and replace it with Work that is not *defective.* CONTRACTOR shall pay all claims, costs, losses and damages caused by or resulting from such correction or removal (including but not limited to all costs of repair or replacement of work of others).

> 13.12.1 ... If CONTRACTOR does not promptly comply with the terms of such instructions, or in an emergency where delay would cause serious risk of loss or damage, OWNER may have the *defective* Work corrected or the rejected Work removed and replaced, and all claims, costs, losses and damages caused by or resulting from such removal and replacement (including but not limited to all costs of repair or replacement of work of others) will be paid by CONTRACTOR.

Hedquist notes that pursuant to paragraph (A) of the subcontract, these clear and unambiguous provisions of the Main Contract apply to Scherer. Hedquist contends that since Scherer did not rectify its defective work within a reasonable time after notice, it was entitled under the terms of the Main Contract to withhold payment to Scherer to cover its costs associated with repairing that work.

██ [¶ 32] The district court concluded that Hedquist had breached the contract because it had failed to give Scherer reasonable notice to make reparation under the applicable contract terms. "Where, as here, no time for performance is specified in a contract, the law implies performance must be within a reasonable time, and what is a reasonable time depends upon the circumstances of each case." *G.C.I., Inc. v. Haught,* 7 P.3d 906, 909 (Wyo.2000). "What constitutes a reasonable time in any particular case is a question of fact." *Id.* We will not reverse the district court's finding unless it was clearly erroneous. *Id.*

[¶ 33] In addition to the clauses noted above, the Main Contract also contains the following relevant provision:

> 13.14 If CONTRACTOR fails within a reasonable time after written notice from ENGINEER to correct *defective* Work or to remove and replace rejected Work as required by ENGINEER in accordance with paragraph 13.11, or if CONTRACTOR fails to perform the Work in accordance with the Contract Documents, or if CONTRACTOR fails to comply with any other provision of the Contract Documents, OWNER may, after seven days' written notice to CONTRACTOR, correct and remedy any such deficiency.

The subcontract between Scherer and Hedquist contains a parallel provision:

> [The Subcontractor agrees] [t]o commence and at all times to carry on, perform and complete [the] SUBCONTRACT to [t]he full and complete satisfaction [of] HEDQUIST, and of the Engineer or OWNER. It is specifically understood and agreed that in the event HEDQUIST shall at any time be of the opinion the SUBCONTRACTOR is not proceeding with diligence and in such a manner as to satisfactorily complete said work within the required time, then and in that event HEDQUIST shall have the right, after reasonable notice, to take over said work and to complete the same at the cost and expense of the SUBCONTRACTOR, without prejudice to HEDQUIST'S other rights or remedies for any loss or damage sustained.

Under the clear and unambiguous terms of the Subcontract and the Main Contract, Hedquist was required to give Scherer reasonable notice prior to taking over the work and completing it at Scherer's expense.

[¶ 34] Hedquist claims that it had concerns about the quality of Scherer's work almost from the beginning of the Project in the early summer of 1998. However, there is no written evidence of any demand by Hedquist for Scherer to correct any alleged deficiencies in its work prior to the exchange of letters between the parties' attorneys on June 30, and July 1, 1999. As we noted in our statement of the facts, Hedquist demanded that Scherer respond by 5 p.m. on July 1, to the demand that it be at the job site on July 6, to make the necessary repairs. At the time that this demand was made, Scherer was on an out-of-town job site and could not be reached. Furthermore, Hedquist was informed that Scherer had another project scheduled for July 6. Nevertheless, when Scherer did not respond by the end of the day on July 1, Hedquist proceeded to make alternative arrangements for repairing the deficiencies.

[¶ 35] We agree with the district court that Hedquist did not give Scherer reasonable notice. There is no evidence of any written demand prior to the June 30/July 1 letters by Hedquist that Scherer rectify its work on the Project. Hedquist claims that Scherer was well aware of the problems associated with its work long before the exchange of these letters. There is no doubt that Scherer was aware of the problems. However, for several months prior to this, Hedquist was also aware that Scherer disputed the cause of the deficiencies in the asphalted areas. The fact that Scherer was aware of alleged problems does not equate with a demand by Hedquist to make the repairs. The Main Contract specifically requires written notice, and Hedquist has not pointed to any evidence of such prior to the June 30/July 1 letters.

[¶ 36] The time between the letters on June 30 and July 1, and the date set for the repair work on July 6, was not reasonable. It was only a six-day notice, which does not even comply with the Main Contract's seven-day requirement. Further, Hedquist had demanded a reply by 5 p.m. on the day it sent the notice despite the knowledge that not only was Scherer unavailable to reply that day, but it was already scheduled for another job on July 6. Hedquist simply did not give Scherer a reasonable time to reply under the circumstances. The district court's finding was not clearly unreasonable.

## CONCLUSION

[¶ 37] In Case No. 00–106, we adopt § 205 of the Restatement (Second) of Con-

tracts and hold that all commercial contracts have an implied covenant of good faith and fair dealing. We reverse that portion of the district court's summary judgment and remand for reconsideration of Hedquist's motion in light of our decision. All other aspects of the district court's summary judgment are affirmed.

[¶ 38] In Case No. 00–107, we conclude that the district court's determination that Hedquist had failed to provide reasonable notice to Scherer to repair deficiencies in its work is not clearly erroneous. The district court's order is affirmed in its entirety.