2002 WY 47

**CENTRAL WYOMING MEDICAL LABORATORY, LLC, a Wyoming limited liability company, Appellant (Plaintiff),**

v.

**MEDICAL TESTING LAB, INC., a Wyoming corporation, Barbara Allen, Kathy Allison, Genelle Bonnel, Marianne Henley, Karen Koenekamp, Nancy Neubert, Heidi Palmer, Valerie Sprecher, Nancy Stewart, Linda Stribling, Ronald Stinson and Anita Stinson, Appellees (Defendants).**

No. 01–126.

Supreme Court of Wyoming.

March 28, 2002.

Representing Appellant: James R. Bell and Kathleen Swanson of Murane & Bostwick, LLC, Casper, WY. Argument by Ms. Kathleen Swanson.

Representing Appellees Medical Testing Lab, Inc.; Allen; Allison–Wolter; Bonnel; Henley; Koenekamp; Neubert; Palmer; Sprecher; Stewart; and Stribling: W.W. Reeves of Reeves & Miller, Casper, WY. Argument by Mr. Reeves.

Representing Appellees Dr. Ronald Stinson and Dr. Anita Stinson: Judith Studer of Schwartz, Bon, Walker & Studer, LLC, Casper, WY. Argument by Ms. Studer.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] Appellant, Central Wyoming Medical Laboratory, Limited Liability Company (hereafter Med Lab), seeks review of an order of the district court granting summary judgment in favor of Appellees. The Appellees are Medical Testing Lab, Inc., (hereafter MTL), Ronald Stinson and Anita Stinson (hereafter Stinsons), and a group of individuals [1] who once served as employees for Med Lab, but who did, or now do, own an interest in or work for MTL (hereafter Employees). Med Lab sought damages from the Appellees because they caused it to be damaged when they conspired to interfere with the sale of Med Lab to Clinical Laboratories of Cheyenne (hereafter Dynacare [2]), to interfere with

---

1. Those individuals are: Barbara Allen, Kathy Allison, Genelle Bonnel, Marianne Henley, Karen Koenekamp, Nancy Neubert, Heidi Palmer, Valerie Sprecher, Nancy Stewart, and Linda Strib-ing. It is alleged that these are the primary owners of MTL.

2. Although the asset purchase agreement identified the purchaser as Cheyenne Clinical Labora-

a contract between Med Lab and Wyoming Medical Center (hereafter WMC), to interfere with Med Lab's contractual relations with its customers, clients, and WMC, as well as other claims sounding in fraud, tortious interference with business and economics rights, violation of a covenant not to compete, and civil conspiracy. In addition, Med Lab sought punitive damages from Appellees. After the submission of briefs and a hearing on the Appellees' motions for summary judgment, the district court determined that Med Lab had assigned all of its interest in these claims to Dynacare and, therefore, Appellees were entitled to judgment as a matter of law.

[¶2] We will reverse the order granting summary judgment and remand to the district court for further proceedings consistent with this opinion.

## ISSUE

[¶3] Med Lab phrases the issue presented for review this way:

Whether the trial court erred in finding that there was no genuine issue of material fact that Appellant transferred all of its claims alleged against the Appellees to third parties as part of its asset purchase agreement.

MTL and the Employees contend this is the issue:

Whether the trial court correctly determined that the contract for the sale of Appellant's business unambiguously conveyed to the purchaser of the business the claims sued on, so that Appellees were entitled to judgment as a matter of law.

The Stinsons advance these proposed issues:

1. Did the trial court correctly rule that [Med Lab] transferred all claims asserted in this action pursuant to an asset purchase agreement?

A. Does explanatory language as to what is included as assets limit the sale of all assets?

B. Should a specific list of excluded assets be read expansively in order to restrict the assets sold?

C. Can parol evidence be used to show intent contrary to the unambiguous language of the agreement?

2. Whether there exist sufficient allegations and/or evidence of fraud and constructive fraud to sustain such claims.

3. Does [Med Lab] have any basis to support its alleged civil conspiracy claim?

## FACTS

[¶4] The facts we set out are the facts alleged by Med Lab in its complaint. For purposes of disposition of this case, the following factual contentions are assumed to be true. Med Lab was a medical testing laboratory providing services to the medical community in Casper. It was owned by Edward D. Hobart, Jr. (Hobart). Hobart is a pathologist who practiced in the Casper area. MTL is also a medical testing laboratory, which eventually competed with Med Lab in the Casper area. All of the Employees were once employed by Med Lab, but now are owners and/or employees of MTL. The Stinsons are husband and wife and both are pathologists who have an ownership interest in Central Wyoming Pathology, Inc. (hereafter CWP). The Stinsons direct the daily operations of CWP. Med Lab alleged that the Stinsons have or had an ownership interest, monetary interest, or monetary stake in MTL.

[¶5] On April 24, 1993, Ronald Stinson signed an employment agreement with Med Lab, which included a provision that he would not compete within Natrona County for a period of three years from the effective date of the termination of his employment with Med Lab. Ronald Stinson terminated that employment agreement on September 5, 1997. On May 25, 1994, Anita Stinson entered into an employment agreement with Med Lab, which included a provision that she would not compete within Natrona County for a period of three years from the effective date of the termination of her employment with Med Lab. Anita Stinson terminated that employment agreement on March 31, 1998.

tories, the new laboratory was operated as, and referred to by all parties as, Dynacare. Chey-

enne Clinical Laboratories is a subsidiary of Dynacare.

[¶ 6] In early 1998, Hobart began negotiating with the Employees to sell them Med Lab. In conjunction with the negotiations, Hobart provided confidential financial information concerning Med Lab and afforded them an exclusive negotiating period to buy Med Lab. Thereafter, Hobart heard nothing from the Employees about the proposed sale. During this same time period, Hobart alleged that one or more of the Employees began spreading rumors that Med Lab was going to be sold to a nationally known company and that Med Lab employees would lose their jobs. One or more Employees also spread rumors that Med Lab was in financial trouble.

[¶ 7] Also during this same time period, Hobart entered into negotiations with the Stinsons to sell them his interest in CWP. At this same time, CWP entered into negotiations with WMC to extend the exclusive pathology services contract between those two entities. Also at this same time, and as a part of the same transaction, Med Lab and WMC began negotiations for Med Lab to provide specified laboratory services for patients of WMC. Hobart's sale of his interest in CWP was conditioned on the approval of these two agreements. There was yet another aspect to this maze of contracts, and that was that Med Lab agreed to pay CWP a fixed sum (based on a historical average) for the performance of cytology reviews. Hobart claims that he would not have entered into this agreement if he had known that there was a conspiracy afoot to render that agreement very detrimental to Med Lab's interests.

[¶ 8] Hobart also contends that the Stinsons and the Employees entered into a plan to form a laboratory to compete against Med Lab and that the Stinsons knew this would affect the volume of cytology work CWP would perform for Med Lab (thus, rendering the fixed monthly payment Med Lab would pay to CWP very uneconomic). It is alleged that the Employees spread rumors of Med Lab being in financial trouble and being in imminent danger of ceasing business. The Employees did this knowing that information to be false, as well as with a purpose of damaging Med Lab's business and luring away its customers and employees. Med Lab's complaint also contains this allegation:

15. During this same time frame, the Stinsons purposely delayed finalization of the purchase agreement between them and Hobart to allow time for the [Employees] to form their competing laboratory business. The purpose of the delay was to ensure that the competing laboratory business was in place and fully competing at approximately the same [time] the purchase agreement with Hobart and the agreement with Med Lab concerning cytology services was finalized. The Stinsons knew that once the competing lab was in place the volume of cytology work would decrease, thereby putting a financial burden on Med Lab to meet its monthly $6,000 payment obligation. It was the Stinsons' plan, along with the [Employees], to divert cytology work which Med Lab historically had obtained from customers and clients to the new lab and to the detriment of Med Lab.

[¶ 9] Med Lab further alleges that during April, May, and June of 1998, the Employees and the Stinsons began soliciting Med Lab's customers and clients to use the new competing laboratory. Other aspects of this scheme included that the new laboratory decided to have someone other than one of the Stinsons serve as its medical director so that Hobart would not learn of their involvement in the new lab. In late May, plans for the new lab were well under way, articles of incorporation were filed, property for the lab site was leased, and termination packets were obtained for the Employees. One of the Employees, Barbara Allen, was the business manager of Med Lab and held a position of trust, and it was she that was making many of the above-described arrangements. The Employees intended to terminate their employment in as close proximity to one another as possible so as to disrupt Med Lab's business, or at least give MTL an advantage. Many of the Employees were medical technicians, without whom Med Lab could not conduct business. On June 1, 1998, Hobart met with the Employees about these matters, but all assured him they were loyal to Med Lab. On June 5, 1998, Employee Stewart was fired because Hobart found, and she admitted,

that she was soliciting Med Lab's customers for MTL. In addition, the proposed medical director for MTL was never so employed, and the medical director ultimately selected was a Daniel Sullivan, M.D., who worked for CWP and was under the supervision and control of the Stinsons. The Stinsons themselves have been and continue to be consultants to MTL. Concurrently with the final preparations for opening MTL, the Stinsons closed their transactions with Hobart, buying his interest in CWP and executing the contract with Med Lab. Med Lab claims that this was done deliberately in order to allow MTL to compete with Med Lab. The Employees violated confidentiality agreements they had with Med Lab in order to woo away its customers and clients and took a series of other actions detrimental to Med Lab, which included the sabotage of equipment, deliberately delaying work for up to two weeks, spreading rumors of Med Lab's impending bankruptcy and that Hobart's home was up for sale, downloading confidential and proprietary information, and taking personal property of Med Lab without permission. The Employees then quit with anywhere from a single day to a few days' notice, when the Med Lab policy was to give two weeks' notice. As a result, Med Lab had to hire outside help at extra expense. Because its ability to provide service was compromised by the mass resignations, Med Lab's business was disrupted, its business reputation was damaged, and it lost existing customers and accounts. Hobart contends that the Stinsons also used their influence to interfere with Med Lab's existing agreements with WMC, and it has consequently lost revenue.

[¶ 10] In September of 1998, Med Lab began negotiations to sell its assets to another laboratory company. Med Lab alleges that WMC pathology personnel, including the Stinsons, frustrated one such negotiation because they disparaged both Med Lab and Hobart. The actions of the Stinsons almost frustrated a second negotiated sale, but Med Lab was able to restart those negotiations, and a sale finally resulted, though at a considerable loss to Med Lab. In addition, Med Lab suffered losses due to decreased volume of work beginning in July of 1998, until its assets were purchased in April of 1999.

[¶ 11] In its complaint, Med Lab made the following claims for relief:

1. Against the Stinsons, a claim of fraud based on their concealment and/or failure to disclose information which was detrimental to Med Lab.

2. Against the Stinsons, a claim of constructive fraud.

3. Against the Stinsons, breach of contract for violation of their covenants not to compete, which damaged Med Lab during the period immediately preceding its sale.

4. Against the Stinsons, tortious interference with prospective advantage in that Stinsons interfered with Med Lab's attempts to sell its assets.

5. Against the Stinsons, tortious interference with contract in that Stinsons intentionally interfered with Med Lab's contract to perform reference laboratory work for WMC.

6. Against the Employees, breach of the duty of loyalty. The Employees had a contractual duty to safeguard confidential information and to act solely for the benefit of Med Lab. Med Lab contends it suffered damage as a result and the Employees should be required to repay all wages paid them during the period of disloyalty.

7. Against the Employees, tortious interference with contract in that Employees attempted to interfere with contractual relations between Med Lab and its customers and clients.

8. Against all Appellees, civil conspiracy in that all Appellees conspired to put Med Lab out of business.

9. As to all Appellees, Med Lab sought punitive damages, asserting that the Appellees acted intentionally, maliciously, willfully and wantonly, in reckless disregard of the consequences to Med Lab.

Med Lab's complaint was accompanied by a jury demand.

[¶ 12] In fairness, it is appropriate that we point out that the Appellees vigorously contested these allegations and, indeed, it is evident from the record extant that Hobart was experiencing considerable difficulties within the Casper medical community which

were only partially related to the travails of Med Lab. However, for the purposes of summary judgment, the Appellees concede that all facts well pleaded by Med Lab may be read as true. Appellees' simple and very direct assertion is that any right of recovery was not owned by Med Lab, but by its successor in interest, Dynacare.

[¶ 13] The district court issued a decision letter, which concluded that there were no genuine issues of material fact and that Appellees were entitled to judgment as a matter of law. The district court provided this reasoning for its decision:

> The plaintiff seeks damages caused to its business from activities beginning in 1998 with injuries continuing until sale of most assets of plaintiff's business in April of 1999. The sale included all assets other than listed excluded assets. Among the assets specifically sold were going concern value, goodwill, all contracts, software, supplies, books and records, the customer list, and all plaintiff's claims against third parties relating to the transferred assets. The list of excluded assets consists of ten items. The tenth excluded asset is plaintiff's "claims against third parties relating to items that are not included in the assets." Of the other nine items not included in the assets, none is the subject of damages claimed in the complaint. Instead, the damages were to assets that are conveyed in the sale.
>
> The sale contract is not ambiguous. If the parties to that contract had not wanted to convey plaintiff's claims in this action, they could have included that provision. Instead, plaintiff transferred all of its claims against third parties relating to the transferred assets. That includes the claims in this case.
>
> Reviewing the complaint, the first two claims allege fraud and constructive fraud against defendants Stinsons because, while negotiating a contract between plaintiff and Central Wyoming Pathology, Stinsons did not disclose that they were involved in establishing a lab to compete with plaintiff. If plaintiff was injured in connection with this contract, that cause of action was transferred in the asset sale. The com-

plaint also states that plaintiff's chief executive knew of the incorporation of the competing lab before he closed on this contract. Thus, it is not clear that the nondisclosure by Stinsons was important.

> The third cause of action against the Stinsons is for breach of their covenants not to compete with plaintiff. Again, these contracts and rights of action were sold by plaintiff.
>
> The fourth cause of action against Stinsons is for tortious interference with the prospective advantage plaintiff had in two proposed sales of the business. The allegation is that the prospective buyers met with Stinsons and were told that Stinsons would not support any agreement involving Dr. Hobart or plaintiff. The significance of this is not clear to me. Nor is it clear why Stinsons should not have been able to say this. In any event, the cause of action was transferred with the other business assets.
>
> The fifth cause of action against Stinsons concerns tortious interference with a contract between Wyoming Medical Center and plaintiff. Again, the contract and cause of action were transferred in the sale.
>
> The sixth cause of action is against the former employees for breach of duty of loyalty in the manner specified in paragraphs 25 and 26 of the complaint. Those paragraphs allege that the employees committed unauthorized acts with business equipment, records, and other property and assets which were conveyed in the sale. Any cause of action for injury to those items was sold by plaintiff.
>
> The seventh cause of action alleges tortious interference with contracts by the former employees. Those contracts and rights of action were conveyed in the sale of assets.
>
> Without an underlying cause of action in tort, plaintiff cannot claim civil conspiracy or punitive damages.

## STANDARD OF REVIEW

[¶ 14] The issue raised necessitates the use of two distinct standards of review.

First, of course, the standard applicable to the grant of a motion for summary judgment and, second, those principles that apply to the construction of contracts.

[¶ 15] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. *Reed v. Miles Land and Livestock Company,* 2001 WY 16, ¶ 9, 18 P.3d 1161, ¶ 9 (2001). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. *Scherer Construction, LLC v. Hedquist Construction, Inc.,* 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (2001).

[¶ 16] Our primary focus in construing or interpreting a contract is to determine the parties' intent, and our initial inquiry centers on whether the language of the contract is clear and unambiguous. If the language of the contract is clear and unambiguous, then we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract. Common sense and good faith are leading precepts of contract construction, and the interpretation and construction of contracts is a matter of law for the courts. *Reed,* ¶ 10. We have also recognized that the language of a contract is to be construed within the context in which it was written, and the court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made. *Polo Ranch Company v. City of Cheyenne,* 969 P.2d 132, 136 (Wyo.1998); *Williams Gas Processing—Wamsutter Company v. Union Pacific Resources Company,*

2001 WY 57, ¶¶ 11–12, 25 P.3d 1064 ¶¶ 11–12 (2001).

## DISCUSSION

[¶ 17] We begin our discussion with a notation that the contract in issue was 47 pages in length, with an additional 22 pages of exhibits. We note, as well, that this was not a particularly complex transaction; indeed, in most respects, it was as routine and straightforward as contract matters can get. Reduced to its nub, the case involves Med Lab's contention that it intended to retain the right to sue these Appellees, and the Appellees' counter-contention that the contract does not say that, indeed, Appellees contend that the contract unambiguously assigns any lawsuits, such as those at issue herein, to Dynacare and, thus, Med Lab has no remaining interest in this litigation.

[¶ 18] The contract provided that Med Lab sold to Dynacare "all of the Assets other than the Excluded Assets," and that "[t]he Assets shall include all of the assets of the Seller that are used or useful in the Acquired Business and that are not specifically described as Excluded Assets[.]" The "Assets" sold to Dynacare are set out at length using the adjective "all" to apply to each distinct category of assets (and there are 12 categories of assets included in the contract, the last of which is simply titled "Other Assets"). However, the word "all" is qualified in that final category with this phrase: "[I]n each case excluding the Excluded Assets." Among the "Excluded Assets" was this item: "All of Seller's claims against third parties relating to items that are not included in the Assets." The contract did provide that Dynacare was assigned, "[a]ll other intangible and tangible assets of Seller associated with or used in the operation of the Acquired Business[.]" The phrase "Acquired Business" was defined by the contract:

"Acquired Business" shall mean the business of providing laboratory services carried on by the Seller at the Facility; at the collection stations, satellite laboratories and storage sites utilized by the Seller; and at the hospitals or other facilities to which the Seller provides laboratory services; in each case as the same has been

conducted during the twelve months preceding the date hereof and as the same shall be conducted between the date hereof and the Closing Date.

[¶ 19] In addition, Paragraph 2.7 included in the sale "all the Seller's claims against third parties relating to items included in the Assets[.]" Paragraph 8.8 of the contract (and the associated Schedule 8.8) purported to itemize:

[A]ll of the Seller's material security deposits, security bonds and claims against third parties of a similar nature relating primarily to items included in Assets and sets forth the party with whom material security has been deposited or, with respect to those claims of Seller against third parties which the Seller is transferring to the Buyer hereunder, the party against whom claims have been asserted, the amount of the claim and the present status or the resolution of the claim.

Schedule 8.8 contained only the word "None." Paragraph 8.12 provided that: "None of the Assets being sold by the Seller to the Buyer pursuant to this Agreement are subject to any claim or dispute[.]"

[¶ 20] In structuring their argument, the Appellees rely in significant part on the case of *Knott v. McDonald's Corporation*, 147 F.3d 1065, 1067–68 (9th Cir.1998) wherein the appeals court relied on contract language to the effect that the sellers had assigned " '*all* [their] right, title, and interest' to the [buyers]." *Id.*, at 1067 (emphasis in original). The reviewing court then concluded that: "In short, 'all' means all." *Id.* In the instant case, "all" very clearly meant something less than *all;* indeed, we conclude that it did not mean *all* at all, and its use did not serve to transfer or assign to Dynacare the claims at issue in this appeal. Much of the other language used in the *Knott* case, especially that relating to the construction of contracts, and to the construction of an assignment of contract rights in particular, is substantially the same as the parallel Wyoming law set out herein. The general rules applicable to the construction of an assignment, such as that at issue here, are these:

If a contrary intention is not shown, an assignment ordinarily passes whatever is necessary to make it completely effectual, and vests in the assignee all rights, remedies, and contingent benefits which are incidental to the thing assigned, except those which are personal to the assignor and for his benefit only. . . .

In the final analysis, however, the question of what rights or remedies will pass as incidental to the thing assigned is dependent entirely on the intention of the parties; and the assignee will acquire no right to incidents which it is clear the parties did not intend to pass, or which it would be inequitable to pass because of resulting injury to the assignor.

6A C.J.S. *Assignments* § 76 (1975); *also see* 6 Am.Jur.2d *Assignments* §§ 145 and 148 (1999); *also see Allied Chemical Corporation v. American Independent Oil Company*, 623 S.W.2d 760, 763 (Tex.App.1981) (applying rule summarized in C.J.S., *Assignments,* that intention of parties must be gleaned from entirety of contract; summary judgment appropriate where contract as a whole unambiguously established limitations of assignment).

In the absence of a contrary intention, an assignment usually passes as incidents all ancillary remedies and rights of action which the assignor had or would have had for the enforcement of the right or chose assigned.

Unless an assignment specifically or impliedly designates them, accrued causes of action arising out of an assigned contract, whether ex contractu or ex delicto, do not pass under the assignment as incidental to the contract if they can be asserted by the assignor independently of his continued ownership of the contract and are not essential to a continued enforcement of the contract. If, however, an accrued cause of action cannot be asserted apart from the contract out of which it arises or is essential to a complete and adequate enforcement of the contract, it passes with an assignment of the contract as an incident thereof.

. . . .

An assignment of a title or interest in property, however, does not, of itself, con-

stitute an assignment of an existing cause of action for a tort previously committed with reference to the property; and a cause of action for fraud on the assignor, which induced the purchase of the property or the creation of the debt or chose assigned, is often held not to pass to the assignee, except where an intention of the assignor to assign such cause of action is apparent or can be inferred.

6A C.J.S. *Assignments* § 77 (1975).

[¶ 21] We have previously held that an assignment is a contract and is interpreted or construed according to rules of contract construction. *Boley v. Greenough*, 2001 WY 47, ¶¶ 1–5, 22 P.3d 854, ¶¶ 1–5 (Wyo.2001); *Farr v. Link*, 746 P.2d 431, 433 (Wyo.1987). An assignment is an act or expression (e.g., a writing) of intention by which one person causes to transfer, set over or vest in another a right or property or an interest therein. *Matter of Estate of Boyd*, 606 P.2d 1243, 1246 (Wyo.1980); and *see generally Wyoming Wool Marketing Association v. Urruty*, 394 P.2d 905, 907–9 (Wyo.1964). Applying the rules of contract construction set out above, we are obliged to conclude that the contract is not ambiguous, and that it is clear that the contract did not operate so as to assign the causes of action at issue in this appeal to Dynacare. For these reasons, the order granting summary judgment must be reversed and this matter remanded to the district court for further proceedings consistent with this opinion.

## CONCLUSION

[¶ 22] As noted more fully above, we have reviewed the same materials from the record as did the district court. The contract terms at issue are not ambiguous, and our review of the applicable terms of the contract convinces us that the intent of the parties was that the causes of action at issue here were not a part of the sale of Med Lab to Dynacare. Although Med Lab, through Hobart and his attorney, submitted extrinsic evidence as to what Med Lab's intention was, we have not relied on that material, as was the case with the district court. Looking at all of the terms of the contract in context, as we must, we conclude that the district court erred in granting summary judgment in favor of the Appellees. The order granting summary judgment is, therefore, reversed and remanded to the district court for further proceedings consistent with this opinion.

GOLDEN, J., dissenting.

[¶ 23] I respectfully dissent. In my judgment, the district court's decision letter, referred to in the majority opinion, succinctly and correctly analyzed this dispute. I would affirm the summary judgment to all appellees.