2001 WY 57

**WILLIAMS GAS PROCESSING—WAMSUTTER COMPANY, and Williams Gas Processing Company, Appellants (Plaintiffs),**

v.

**UNION PACIFIC RESOURCES COMPANY, Union Pacific Fuels, Inc., and Fuels Acquisition Company, Appellees (Defendants).**

No. 00–40.

Supreme Court of Wyoming.

June 20, 2001.

Rehearing Denied July 31, 2001.

Representing Appellant: Ford T. Bussart of Bussart, West, Rossetti, Piaia & Tyler, P.C., Rock Springs, WY; and John D. Ray and Robert Palmer Rees of Fabian & Clendenin of Salt Lake City, UT. Argument by Mr. Rees.

Representing Appellee: Paul J. Hickey of Hickey, Mackey, Evans & Walker, Cheyenne, WY; John B. Thomas of Hicks, Thomas & Lilienstern, Houston, TX; Jerome T. Wolf and Jan P. Helder Jr. of Sonnenschein, Nath & Rosenthal, Kansas City, MO; and Thomas F. Reese and Morris R. Massey of Brown, Drew & Massey, LLP, Casper, WY. Argument by Mr. Hickey.

Before LEHMAN, C.J., and GOLDEN, HILL, JJ.; and DAN SPANGLER, D.J. (Retired).

HILL, Justice.

[¶1] In this appeal, we review Appellants', Williams Gas Processing—Wamsutter Division (a Delaware corporation) and Williams Gas Processing Company (a Delaware corporation) (hereafter collectively "Williams"), challenge to an order of the district court that denied a motion for partial summary judgment in favor of Williams. The district court instead granted a motion for summary judgment in favor of Appellees, Union Pacific Resources Company (a Delaware corporation) (hereafter "UPRC" or "UPR"), Union Pacific Fuels, Inc. (a Dela-

ware corporation) (hereafter "UPF [1]"), and Fuels Acquisition Company (a Delaware corporation) (hereafter "FAC"), and Williams also challenges that decision on a variety of grounds. According to Williams, UPRC structured its transfer of a gas processing plant and gathering system (hereafter "Echo System") to Duke Energy Field Services, Inc. (hereafter "DEFS" or "Duke") in such a manner as to violate the preferential purchase rights afforded Williams under the agreements between Williams and UPRC. Williams contends that the district court's resolution of this case is contrary to its unambiguous contractual rights and applicable law. In other arguments, Williams contends that there are genuine issues of material fact which must be resolved by a jury, and that the district court abused its discretion in disallowing discovery requested by Williams.

[¶2] We will reverse and remand for further proceedings consistent with this opinion.

## ISSUES

[¶3] Williams provides this statement of the issues for review:

The issues on appeal are whether the lower court erred in denying Plaintiffs–Appellants Williams' motion for partial summary judgment and granting the Defendants–Appellees' cross-motion for summary judgment. Specifically:

1. Williams and defendant UPRC were co-owners of a gas plant and gathering system. The Ownership Agreements granted each owner a preferential purchase right if the other owner "desires to sell" its co-interests, either "as a separate transaction" or "in a package of assets." Did the lower court err in ruling that UPRC did not "sell" its co-interests to Duke when it executed a contract mandating each of the following steps:

a. UPRC must create a new second-tier subsidiary (*i.e.*, defendant FAC),

b. UPRC must next deed its co-interests into FAC, and

c. UPRC must next sell to Duke all the stock of defendant UP Fuels (*i.e.*, UPRC's

---

1. Union Pacific Fuels, Inc. is also denominated "UPFuels," "UP Fuels," and UPFI in some of the quoted material, but they are all one and the same.

first-tier subsidiary and FAC's parent company)?

2. An exemption to Williams' preference rights permitted UPRC to transfer its co-interests to any "Affiliate." Did the lower court err in holding that FAC was still an "Affiliate" of UPRC on the transfer date, even though UPRC was already contractually committed to sell all the stock of FAC's parent company to Duke?

3. A second exception to Williams' preference rights permitted UPRC to dispose of its co-interests by "merger." Did the lower court err in holding that UPRC disposed of its co-interests by a merger, even though UPRC itself never merged?

4. Did the lower court err in not ruling that the following were genuine issues of material fact precluding summary judgment in favor of Defendants–Appellees:

a. When UPRC and Williams executed their Ownership Agreements, did both parties intend that their preferential rights could not be avoided by a multi-step transaction?

b. If a multi-step transfer does not trigger the preference rights *as written,* did UPRC and Williams commit a *mutual mistake* in drafting their preference rights language?

5. Did the lower court abuse its discretion by not granting plaintiffs an opportunity, as requested pursuant to Wyoming Rule of Civil Procedure 56(f), to take depositions and conduct other discovery?

Appellees propose these as the issues:

Although Williams now attempts to raise numerous issues related to the Echo System Agreements, the ultimate issue in this appeal is:

1. Whether the district court was correct in entering summary judgment for UPR based upon its construction of the unambiguous provisions of the Echo System Agreements?

Because Williams has raised novel issues on appeal, this Court should address additional procedural issues, specifically:

2. Whether Williams can raise for the first time on appeal, theories of contract construction not presented to the district court?

3. Whether the district court abused its discretion in not allowing discovery when both parties argued the contracts were unambiguous and requested deferral of discovery?

In its reply brief, Williams articulates these additional issues:

The new issues and arguments raised in Appellees' Brief, addressed herein, are:

1. Does this Court's intervening decision in *McGuire v. Lowery* support or reject Appellants' claim that a "sale" occurred under *Raymond* (Wyoming) and *Prince* (Utah)?

2. Is Appellants' claim that a "sale" occurred upon execution of the November 20, 1998 Purchase Agreement a new argument on appeal?

3. Does the magnitude of the overall Purchase Agreement mean that a "sale" of the individual Property did not occur?

4. Does Appellees' Brief establish that FAC was an exempt "Affiliate" as of its December 2 deed from UPRC?

5. Does Appellees' Brief identify any exempt "merger" or "reorganization" within the language of Article 9.3?

6. Do Appellees' own constructions of Articles 9.1, 9.2 and 9.3 establish that those clauses are ambiguous?

7. Have Appellants established a prima facie case of mutual mistake?

8. Have Appellants waived their right to request relief under Rule 56(f)?

## FACTS

[¶ 4] On August 27, 1993, Williams and UPRC entered into two agreements. The first was entitled Echo Springs Gas Processing Plant Construction, Ownership and Operation Agreement, and the second was entitled Wamsutter Gas Gathering System Construction, Ownership and Operation Agreement. For purposes of this appeal the terms of both contracts are identical, and the provisions of those contracts, which are set out below, apply equally to both. In those contracts, Williams and UPRC agreed to build a gas processing plant and a gas gathering system,

with Williams owning 66% of the property and UPRC owning 34%[2] of the property. Williams was designated as the operator under both contracts. In 1998, UPRC decided to sell[3] its interests under those contracts, and the process by which that transfer to Duke was achieved created the controversy that must be resolved in this appeal. Of

2. Because the agreements required a 70% vote to do business, UPRC had, in effect, a veto power over the activities of the Echo System and, of course, that power passed to any UPRC successor, *e.g.*, "Duke". Thus, one purpose of the preferential purchase, if not the only purpose of the preferential purchase right, was to protect Williams from being saddled with a hostile or otherwise incompatible co-owner.

3. We use the word "sell" qualifiedly at this juncture. The following, taken from a UPRC affidavit, is its description of what it did:

4. At the beginning of 1998, the business functions of UPR were divided into what were called business units. Those business units organized into the separate areas of "Exploration and Production," "Minerals," and the "GPM Business" (for Gathering, Processing and Marketing). The GPM Business was also commonly referred to as UPFuels, and included virtually all of the gas gathering, processing and marketing assets of UPR. At that time, UPFuels was the seventh largest processor of natural gas in the United States, and owned or managed interests in twenty natural gas processing facilities, including the Echo Springs Gas Processing Plant, located in six different states. This processing capacity was supported by more than four thousand miles of gathering pipelines, including the Wamsutter Gas Gathering System. UPFuels also owned or managed interests in a number of natural gas liquids ("NGL") fractionation plants and NGL pipelines. UPFuels was one of the leading United States marketers of both natural gas and NGL's. As the marketing entity for UPR's natural gas and NGL's, UPFuels was a party to thousands of marketing and transportation contracts directly pertaining to the GPM Business.

5. In April of 1998, the UPR Board of Directors approved a deleveraging plan which included a recommendation to sell the GPM Business. This plan was announced to the public on April 27, 1998. Accordingly, UPR decided to sell UPFuels as a separate corporate unit and to reorganize its business structure and place all GPM Business assets under one company to conform actual ownership with business operations. This reorganization ultimately resulted in all GPM assets being placed under the corporate umbrella of Union Pacific Fuels, Inc.

6. In June and July 1998, UPR began to seek buyers for the UPFuels and sought bids for the stock of the entity which would ultimately hold the UPFuels assets. Williams Energy Group was one of the parties that expressed an interest in

central importance to this appeal are these provisions of the Echo System agreements:

## IX. SALE OF PLANT [SYSTEM] INTEREST

9.1 Should any Owner[4] desire to sell all or part of its interest in the Plant

acquiring UP Fuels and was sent certain evaluation materials relating to a possible acquisition. Williams subsequently sent UPR a preliminary indication of interest which included a dollar valuation for the stock of the entity which would hold UPFuels assets. However, Williams was not invited to attend the UPFuels data room due to the amount of the valuation. On November 20, 1998, UPR agreed to sell Union Pacific Fuels, Inc., to Duke Energy Field services, Inc. (the "Buyer") through a merger of Union Pacific Fuels, Inc. and an affiliate of the Buyer.

This description of the transfer/sale/merger is fleshed out by this excerpt from another UPRC affidavit:

3. As Assistant Secretary of UPR, my job duties and responsibilities include causing the formation and incorporation of corporate entities and maintaining corporate records on behalf of UPR and its affiliates.

4. An agreement was signed in November 1998 to sell UPR's wholly owned subsidiary Union Pacific Fuels, Inc. ("UP Fuels") by merger (the "Merger Transaction") to Duke Energy Field Services, Inc. ("Duke") by merging that entity with an affiliate of Duke. The Merger Transaction resulted in the direct or indirect transfer of ownership to Duke of the stock of more than 38 corporate entities.

5. From November 4, 1998 through March 1999 Fuels Acquisition Company was a wholly-owned subsidiary of Union Pacific Fuels, Inc., and Union Pacific Fuels, Inc. was a wholly-owned subsidiary of UPR.

4. In its argument UPRC recites that "Owner," as used in this context means: "[A]ny entity that owns an interest in the plant." We do not agree with that. That definition of "owners" would apply to any "Owners" other than Williams and UPRC who might come to be included as an owner of the Echo System (of course, none ever did, so that definition of "Owners" serves no purpose for purposes of this appeal). We think "Owner," in the instant context, is captured by the opening paragraph of the agreements:

This Agreement, made and entered into as of August 27, 1993, by and between UNION PACIFIC RESOURCES COMPANY, hereinafter referred to individually as "UPRC," WILLIAMS GAS PROCESSING COMPANY, hereinafter referred to as "WGP," and WILLIAMS FIELD SERVICES—ROCKY MOUNTAIN REGION COMPANY, an Affiliate of WGP, hereinafter referred to as "WFS" or "Operator." WGP and

[System] to a non-Affiliate [5] as a separate transaction, it shall promptly give written notice to the other Owners with full information concerning its proposed sale, which shall include the name and address of any prospective purchaser, the purchase price, and all other terms of any offer received by that Owner. Any of the other Owners shall then have an optional prior right, for a period of thirty (30) days after receipt of the notice, to purchase on the same terms and conditions the entire interest which the other Owner proposes to sell; and, if this optional right is exercised, the purchasing Owners shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing·Owners.

9.2 Should any Owner desire to sell or trade its interest in the Plant [System] to a non-Affiliate in a package of assets, it shall promptly give written notice to the other Owners with full information concerning the proposed sale and the selling Owner's valuation of its interest in the Plant [System]. Each Owner desiring to buy the selling Owner's interest ("Buying owner") must so notify the selling Owner in writing within thirty (30) business days of receipt of the selling Owner's notice. Such notice shall state whether the Buying Owner accepts or rejects the selling Owner's valuation of its interest.

. . . .

9.3 If all other Owners fail to exercise the option, the Owner desiring to sell shall be at liberty to close a sale of its interest at any time not. later than one hundred twenty (120) days after the end of the option period to the prospective purchaser at a price not less than and on terms no more favorable to the purchaser than the price and terms stated in the aforemen-

tioned notice; and if such sale is made, the preferential right to purchase shall continue as to the interest acquired by said purchaser. If the interest is not so sold within such 120–day period, then the provisions hereinabove shall apply, in the event of a subsequent offer to sell such interest, as though such interest had never been offered for sale. However, there shall be no preferential right to purchase in those cases where any party [6] wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

[¶ 5] On November 20, 1998, UPRC and UPF entered into a Merger and Purchase Agreement (the MPA) with Duke. The essence of Williams' argument is that the execution of this contract, and the latter but associated transfer of the Echo System to Duke, triggered its preferential right to purchase the Plant and the System under the terms set out above. On December 2, 1998, Williams was made aware of the transfer. On December 23, 1998, Williams filed its complaint to block the transfer, as well as for specific performance of its preferential purchase rights. By order entered on March 8, 1999, the parties stipulated that the transaction could close but that UPRC and Duke would abide by any ruling of the district court that Williams' preference rights had been triggered.

[¶ 6] A summary of the district court's conclusions is an appropriate embarkation point for our own analysis of this complex case. Although we disagree with portions of the district court's final conclusion, we praise

---

UPRC are sometimes hereinafter referred to individually as "Owner" and collectively as "Owners[.]"

5. "Non–Affiliate" is not defined by the contract, but "Affiliate" is:

"Affiliate" shall mean a corporation or other legal entity (including limited partnership) directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with an Owner. The term

"control," as used herein, means the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the shares of the controlled corporation, or in the case of a limited partnership where an owner is the managing general partner. The Uinta Development Company, partially owned and operated by UPRC, is specifically excluded from the above.

6. "Party" is not defined by the agreement, but we also conclude that it, like "Owners," refers only to UPRC and Williams.

the court for its penetrating and extremely helpful discussion of the issues in its decision letter. Williams contended that UPRC sold the Echo System as a "package of assets." The district court found that the mere fact that the MPA included a schedule entitled, "Purchase Price Allocation," valuing each major gas plant and pipeline interest (a three-page document totaling $1,350,000,-000.00 [7]) did not equate with the creation of a "package of assets." Therefore, the district court granted summary judgment to UPRC on that argument. Williams also contended that at the time the Echo System was transferred to FAC, it was a non-Affiliate as defined by the agreements, but the district court did not find any material facts that supported such a conclusion. Williams contended that UPRC and Duke structured the sale in such a manner as to defeat Williams' preferential purchase rights, and that such machinations amounted to a violation of the duty of good faith and fair dealing that is implied in every contract. The district court determined that the facts, as a matter of law, did not support the existence of the special relationship that is essential to the application of the covenant of good faith and fair dealing. The district court wrapped up its holdings by stating that neither party contended that the agreements were ambiguous, that the agreements were not ambiguous, and that they plainly included an exception to the preferential right to purchase where the interest in the properties were transferred "by merger, reorganization, or consolidation." The district court determined that what occurred in this case was a "merger" and not a "sale." We set out that reasoning in detail:

There were several transfers in this case. First UPRC transferred its interest in the Echo System by deed to FAC, an affiliate of UPRC and wholly owned subsidiary of UP Fuels. Then UPRC created Holding Company, Inc. (HoldCo [8]). The stock of UP Fuels and other UPRC entities engaged in the GPM business were transferred into HoldCo. Finally, HoldCo merged with DEFS.

The transfers that took place prior to the merger of HoldCo and DEFS did not trigger the preferential right because they were transfers to a subsidiary of the parent company. UPRC formed FAC and then transferred its 34% interest in the Echo System into FAC. FAC was a wholly owned subsidiary of UP Fuels which in turn was a wholly owned subsidiary of UPRC, thus, the transfer of the Echo System to FAC did not trigger the preferential rights. The stock of the Echo System was transferred along with other interests in the GPM business into HoldCo which was a wholly owned subsidiary of UPRC; this transfer did not trigger the preferential rights either.

Finally, HoldCo merged with DEFS. Under the Echo System Agreement a merger does not trigger the preferential right to purchase. "[T]here shall be no preferential right to purchase in those cases where any party wishes ... to dispose of its interests by merger[.]" The Echo System Agreement paragraph 9.3. In addition, Defendants' argument that Plaintiffs could have bargained for a change of control clause if they wanted to protect against the intrusion of a stranger into the management of the Echo System is well taken. Since UPRC's interest in the Echo System was transferred to Duke by a merger (HoldCo and DEFS) the *Raymond v. Steen* definition of "sale" does not apply. What does apply in this case is the Echo System Agreement which allowed UPRC to dispose of its interest by merger without triggering the preferential right to purchase. Both parties were sophisticated business entities entering an unambiguous agreement and certainly understood the language which was utilized. The interpretation of an unambiguous contract is a question of law and thus Defendants' motion for summary judgment will be granted.

---

7. The purchase price allocation applicable to the Echo System amounted to $50.7 million.

8. Both parties agree that the creation of HoldCo is not a material fact insofar as the disposition of this case is concerned. It also appears to be agreed that HoldCo was created solely for tax purposes. We agree that the creation of HoldCo is of no special significance, and that fact plays no role in the disposition of this case.

[¶ 7] For good reason, the district court did not devote much attention to the MPA in its summary judgment order. However, for purposes of background, a brief description of some of its provisions is useful to our disposition of this appeal. The MPA's opening paragraph provided:

> AGREEMENT dated as of November 20, 1998 among Union Pacific Resources Company, a Delaware corporation ("**Seller**"), Union Pacific Fuels, Inc., a Delaware corporation and a wholly-owned subsidiary of Seller (the "**Company**"), Duke Energy Field Services, Inc., a Colorado corporation ("**Buyer**"), and DEFS Merger Sub Corp., a Delaware corporation and a wholly-owned subsidiary of Buyer ("**Merger Sub**").

[¶ 8] The MPA then went on to provide that "Merger Sub," which was formed solely for purposes of effecting "the Merger," shall be merged with and into "the Company" and the separate existence of "Merger Sub" shall cease. "The Company" was then to become known as the "**Surviving Corporation**"—although it was required to change its name so as not to resemble that of UPRC, UPF, or any other UP derivative. One of the results of "the Merger" was that Duke would become the owner of "the Company" free and clear of "any lien and free [and clear] of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such Shares)."

[¶ 9] On December 2, 1998, the President of UPF sent the following letter to Williams:

> As you may know [9], Union Pacific Resources Company ("UPR") has signed a definitive agreement with Duke Energy Field Services, Inc. ("Duke") for the acquisition by Duke of UPR's gas gathering, processing and marketing subsidiary, Union Pacific Fuels, Inc. ("UPFI"). Through a merger, UPFI will become a wholly owned subsidiary of Duke. The transaction is expected to close by the end of March, 1999.

> By acquiring UPFI, Duke will also acquire all of the stock of Fuels Acquisition Company, a wholly owned subsidiary of UPFI. Fuels Acquisition Company is the owner of the UPR interests in the Echo Springs Gas Processing Plant and the Wamsutter Gas Gathering System (collectively "the Plant").

> In a July 2, 1998 letter to UPR from Mr. McMillan Hummel, Williams threatened to "take ... legal action" if UPR did not give Williams a right of first refusal to purchase the Plant. The rights of first refusal provisions in the Echo Springs Gas Processing Plant Construction, Ownership and Operation Agreement and the Wamsutter Gas Gathering System Construction, Ownership and Operation Agreement (collectively, the "Agreements") have no application to the transaction with Duke. The stock of Fuels Acquisition Company is wholly owned by UPFI, which is being merged with a Duke subsidiary. Under both the terms of the Agreements and established law, the merger of a company or sale of stock of a company does not constitute a sale of assets by a company such as would trigger the right of first refusal. In short, there are no proper or appropriate grounds for Williams to "take ... legal action" relating to UPR's transaction with Duke.

> Given the fact that the rights of first refusal under the Agreements clearly do not apply to the transaction with Duke, UPR will view any attempt by Williams to disrupt the transaction as tortious interference. Under such circumstance, UPR will seek actual and punitive damages in addition to attorney's fees and costs.

[¶ 10] We also note at this juncture that UPRC and Duke entered into a second agreement, on the same date as the MPA, which detailed the procedures to be followed if supposedly "un-triggered" preference rights, such as those held by Williams in the Echo System, were deemed to be triggered by "an appropriate court."

---

9. The first four words of the letter are intriguing. As best we can tell from the record, the negotiations between UPRC, UPF and Duke were "highly confidential," and UPRC and UPF insisted that they remain "highly confidential" in this Court. As a result, virtually all of the record here was filed under seal, and Williams knows of it only because of discovery in this litigation.

## STANDARDS OF REVIEW

### *Summary Judgment*

[¶ 11] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends on the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. *Reed v. Miles Land and Livestock Company*, 2001 WY 16, ¶ 9, 18 P.3d 1161, ¶ 9, (Wyo. 2001); *Mercado v. Trujillo*, 980 P.2d 824, 825–26 (Wyo.1999). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. *Scherer Construction, LLC v. Hedquist Construction, Inc.*, 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (Wyo. 2001).

### *Construction of Contracts*

[¶ 12] Our primary focus in construing or interpreting a contract is to determine the parties' intent, and our initial inquiry centers on whether the language of the contract is clear and unambiguous. If the language of the contract is clear and unambiguous, then we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract. Common sense and good faith are leading precepts of contract construction, and the interpretation and construction of contracts is a matter of law for the courts. *Reed*, ¶ 10, 18 P.3d 1161. We have also recognized that the language of a contract is to be construed within the context in which it was written, and the court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made. *Polo Ranch Company v. City of Cheyenne*, 969 P.2d 132, 136 (Wyo.1998).

### *Construction of Preferential Purchase Right (Right of First Refusal) Contracts*

[¶ 13] UPRC suggests that we adopt a standard of review that would require this Court to narrowly construe rights of first refusal and other provisions that effectively restrict the free transfer of stock. *Tenneco, Inc. v. Enterprise Products Company*, 925 S.W.2d 640, 646 (Tex.1996). We decline to adopt such a standard. Absent something more (*e.g.*, overreaching, unconscionability), we see no reason to construe such contracts any differently than any other business agreement. The very purpose of such contracts is to restrict free transfer of property (whether stock, assets, real estate, etc.), and it hardly seems logical to treat them more restrictively because they actually achieve the bargained for purpose.

## DISCUSSION

[¶ 14] Our conclusion is that the contracts should be construed as follows:

9.1 Should [UPRC or Williams] desire to sell all or part of its interest in the Plant [System] to a non-Affiliate as a separate transaction, it shall promptly give notice to the other, with full information concerning its proposed sale, which shall include the name and address of any prospective purchaser, the purchase price, and all other terms of any offer received. The other shall then have an optional prior right, for a period of thirty (30) days after receipt of the notice, to purchase on the same terms and conditions the entire interest which the other proposes to sell.

It is also our conclusion that § 9.2 would be construed in exactly the same way as § 9.1. Thus, whether UPRC wanted to sell just the Echo System or to sell it as part of a package of $1.35 billion worth of other assets, the result is the same. Section 9.3 would then be construed as follows:

9.3 * * *. However, there shall be no preferential right to purchase in those cases where [UPRC or Williams] wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, con-

solidation, or sale of all its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which [either UPRC or Williams] owns a majority of the stock.

[¶ 15] It is unmistakable that UPRC desired to sell its interest in the Echo System. It did not wish to merge with Duke or any other corporate entity. Its goal was to reduce its debt by means of a sale of assets. UPRC solicited buyers for those assets and eventually "sold" them to Duke—or at least "sold" them to Duke insofar as the term "sold" was used by the parties in the Echo System Agreements. We will not argue with UPRC's denomination of this transaction as a "merger" for whatever other purposes that may serve. However, for purposes relevant to the resolution of this case, we hold that it was a "sale."

[¶ 16] We are aided in reaching this conclusion by our decision in *Raymond v. Steen*, 882 P.2d 852, 857 (Wyo.1994) wherein we embraced this definition of the word "sale" in the context of a right of first refusal: "[A] sale is made for purposes of a right of first refusal when there is a transfer for value of a significant interest in the subject property to a stranger who thereby gains substantial control over the subject property." *Also see Chapman v. Mutual Life Insurance Company of New York*, 800 P.2d 1147, 1150–52 (Wyo.1990); *Prince v. Elm Investment Company, Inc.*, 649 P.2d 820, 823 (Utah 1982); and *Wilson v. Whinery*, 37 Wash.App. 24, 678 P.2d 354, 356–57 (1984). Our decision in *McGuire v. Lowery*, 2 P.3d 527, 532–33 (Wyo.2000) also sustains our conclusion. The decision there would be analogous to a decision by UPRC to transfer its interests in the Echo System to an affiliate such as UPF—that would not be a sale which triggered the right of first refusal—but Williams would then retain the same future preferential purchase rights vis-à-vis UPF, as it had vis-à-vis UPRC. Although we will not go so far as to characterize what UPRC did as a "sham transaction," we agree with Williams that UPRC's position rests upon a highly tortured and technical reading of the contract terms. We will not adopt a construction of this contract which serves to permit UPRC to evade Williams' right of first refusal. *See Raymond*, 882 P.2d at 857. The agreements did not include a different or more technical definition of "sell" or "sale" and, consistent with the applicable standard of review, we conclude that common sense and good faith mandate application of the general definition set out above. *Polo Ranch*, 969 P.2d at 136.

[¶ 17] We also agree with Williams that our decision in *Rainbow Oil Company v. Christmann*, 656 P.2d 538, 543–44 (Wyo. 1982) does not speak directly to the resolution of this case. In *Rainbow* we held that, under the complex facts present in that case, some transactions were never challenged by the Appellants, some transactions were not sales, and that "[p]urchasing corporate stock does not constitute ... [a sale] of a corporation's ... assets for any purpose with which we are here concerned." 656 P.2d at 544. UPRC purports to see a parallel between this case and the *Rainbow* case, but we are not able to see any pertinence, much less a parallel. Purchase of the Rainbow Oil Company stock got the buyer Rainbow Oil—purchase of the stock at issue here got the buyer bits and pieces of what used to be UPRC. Moreover, it was very clear that in *Rainbow* none of the questioned transactions were designed to frustrate a right of first refusal, nor did any of them actually frustrate a right of first refusal. In the instant case, UPRC's actions transparently were calculated to attempt to do indirectly that which the governing agreements would not allow UPRC to do directly. *See Prince*, 649 P.2d at 823 n. 3. We have carefully reviewed all cases cited by UPRC, in particular, *Tenneco Inc. v. Enterprise Products Company*, 925 S.W.2d 640 (Tex.1996) and *Fina Oil & Chemical v. Amoco Production Company*, 673 So.2d 668 (La. App. 1 Cir.1996), and we found those cases to be instructive. Like the instant case, those cases involved unique and complex sets of facts that bear some similarity to this dispute. However, none of those cases dissuades us from looking primarily to our own cases concerning the construction of contracts, and rights of first refusal in particular. Were we to adopt the arguments propounded by UPRC, we would render the

contract rights Williams bargained for, at arm's length, meaningless. UPRC contends that Williams could have bargained more aggressively, for example, for a "change of control provision." That may be correct, but that argument does not erase the rights that Williams **did** bargain for and received. We do not think that it can be fairly argued that UPRC merely sold the stock of an affiliate via a merger. UPRC did not desire to sell an affiliate; it desired to sell certain assets that were packaged in the form of an affiliate. It is fair to conclude that the preferential purchase rights provisions were the lubricant that greased the skids of the initial agreement reached by Williams and UPRC— just as it would be fair to conclude that attempting to structure the sale of UPRC's GPM Business, in a manner so as to attempt to evade the preferential purchase rights of Williams, lubricated UPRC's bargain with Duke. UPRC contends that Williams unfairly relies in part on an argument that UPRC took a position very similar to that taken by Williams here in the *Tenneco* case, but we find it unnecessary to rely on that position.

[¶ 18] By our decision, we do not rewrite the agreement between UPRC and Duke in any way. However, we will not utilize that agreement in such a manner as to say— "Well, yes, in light of what transpired in 1998 in this case (and in 1996 in the *Tenneco* and *Fina* cases), UPRC did come up with a viable means of rendering the 1993 agreement between it and Williams virtually meaningless." We will limit ourselves to viewing the four corners of the disputed agreements as a whole, in light of all the language that is used in them, and in light of the apparent intent of the parties at the time they entered into the agreements. We hasten to add that our decision is not one that is intended to simplify that which is complex. On the contrary, we view this as an exercise in giving full recognition to a transaction that was merely of relatively ordinary complexity but which has been transported to a much higher plane of complexity by UPRC's "merger" agreement with Duke. Ultimately, of course, it is an exercise in resolving that which must be resolved because the parties were unable in good faith, good conscience, and in good time, to resolve equitably amongst themselves a controversy created by disagreement about the meaning of an unambiguous and fairly simple contract.

[¶ 19] Because of this disposition, we need not address the other issues raised by the parties.

[¶ 20] The order of the district court is reversed, and this matter is remanded to the district court with directions that it enter summary judgment in favor of Williams and against UPRC, as well as for such other additional proceedings as may be necessary to enforce Williams' rights of first refusal with respect to the Echo System.