2005 WY 48

**Richard D. KNORI, Personal Representative of the Estate of Pansy Knori, deceased, Appellant (Defendant),**

v.

**STATE of Wyoming, ex rel., DEPARTMENT OF HEALTH, OFFICE OF MEDICAID, Appellee (Plaintiff).**

**No. 04–189.**

Supreme Court of Wyoming.

April 14, 2005.

---

Representing Appellant: Lawrence B. Hartnett, Law Offices of Lawrence B. Hartnett, Jackson, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Robin Sessions Cooley, Deputy Attorney General; and James P. Espy, Special Assistant Attorney General, Cheyenne, Wyoming. Argument by Mr. Espy.

Before HILL, C.J., and GOLDEN, KITE, and BURKE, JJ., and DONNELL, D.J.

DONNELL, District Judge.

[¶ 1] This case concerns the availability of the defense of equitable estoppel against a governmental agency seeking to collect a judgment on a creditor's claim. The District Court granted the agency's motion for summary judgment. For the reasons stated herein, we affirm.

## ISSUE

[¶ 2] Appellant states the issue as follows:

[I]s equitable estoppel against a governmental agency allowed and an appropriate remedy under Wyoming law when an employee of the Wyoming Department of Family Services, employed as a Medicaid Eligibility Technician, negligently informs and advises an applicant for Medicaid assistance for nursing home care that her family home is permanently exempt from estate recovery under the provisions of W.S. § 42-4-206, and the applicant acts on that advice to her substantial prejudice.

The State addresses the issue somewhat differently:

Whether the District Court correctly ruled that, under the Doctrine of Equitable Estoppel, a governmental employee did not bind the State of Wyoming by making an erroneous, unauthorized oral statement, which was contrary to both federal and state law.

## FACTS

[¶ 3] In late January or early February of 1995, Richard D. Knori (Knori), in his capacity as guardian and conservator of his grandmother, Pansy B. Knori (Pansy), sought advice from Hazel Staley (Staley), a "Medicaid Eligibility Technician," employed by the Wyoming Department of Family Services (the Department). Specifically, Knori inquired as to Pansy's eligibility for Medicaid assistance for nursing home care and as to the long-term liability, if any, of Pansy's estate for reimbursement for the costs of the Medicaid assistance.

[¶ 4] Staley advised Knori that, if Pansy wished to preserve her family home, she need only apply for Medicaid assistance for the nursing home care with the "intent to return home." Staley informed Knori that, once Pansy exhausted her cash assets to the limits for eligibility, Medicaid would pay the costs of the nursing home care. Further, Staley advised that Pansy's real property would be exempt from Medicaid reimbursement recovery, both before and after her death.

[¶ 5] In fact, Staley was incorrect. In 1993, Congress passed the Omnibus Budget Reconciliation Act of 1993 (OBRA), effective July 1, 1993. This Act mandated recovery of Medicaid costs from the estate of a deceased recipient by those states participating in the Medicaid program, of which Wyoming was one. Under OBRA, Wyoming was given one year to bring its laws into compliance with the mandatory estate recovery. Effective July 1, 1994, Wyoming passed Wyo. Stat. Ann. § 42-4-206 (LexisNexis 2003) to conform to OBRA requirements. The intent of the statute was:

[To] implement changes to the Wyoming Medical Assistance and Services Act required by the Federal Omnibus Budget Reconciliation Act of 1993. This act is intended to authorize changes to the state plan for medical assistance and services under chapter 4 of title 42, which are required or authorized by the provisions of the Federal Omnibus Budget Reconciliation Act of 1993, and which are in accordance with the provisions of this act. It is the intent of the legislature that the provisions of this act be interpreted in accordance with construction of that federal act and rules promulgated pursuant to that act.

1994 Wyo. Sess. Laws, ch. 73, § 4. Further, under the provisions of Wyo. Stat. Ann. § 42–2–103(b)(xiii), the state administering department was required to adopt rules necessary to carry out the provisions of § 42–4–206 for "Medicaid Benefit Recovery." Such rules were adopted, effective June 30, 1995. At the time Staley advised Knori, she advised him under the "old" Medicaid rules but not the rules mandating estate recovery that went into effect on June 30, 1995.

[¶ 6] Knori, relying on Staley's representations, assisted Pansy with her Medicaid application. Pansy was approved for Medicaid eligibility beginning April 1, 1995. She received Medicaid benefits, totaling $259,446.38, for medical and nursing home care from 1995 until her death in 2001. After her death, the Department of Health, Office of Medicaid (the Office) filed a claim against Pansy's estate seeking reimbursement for these Medicaid benefits.

[¶ 7] Knori rejected the claim, and the Office filed an action to obtain a judgment on the claim. Although Knori conceded that § 42–4–206 allowed the Office to recover its claim, he argued that the doctrine of equitable estoppel should be applied to prevent any recovery.

## STANDARD OF REVIEW

[¶ 8] The standard for summary judgment under W.R.C.P. 56 is well established in Wyoming:

Summary judgment is appropriate when no genuine issue as to any material fact exists and the prevailing party is entitled to have a judgment as a matter of law. *Eklund v. PRI Environmental, Inc.*, 2001 WY 55 ¶ 10, 25 P.3d 511, ¶ 10 (Wyo.2001). A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense that has been asserted by the parties. *Williams Gas Processing–Wamsutter Co. v. Union Pacific Resources Co.*, 2001 WY 57, ¶ 11, 25 P.3d 1064, ¶ 11 (Wyo.2001). We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all reasonable

inferences that may fairly be drawn from the record. *Id.*

*NuHome Investments, LLC v. Weller*, 2003 WY 171 ¶ 7, 81 P.3d 940, ¶ 7 (Wyo.2003) (quoting *Trabing v. Kinko's, Inc.*, 2002 WY 171, ¶ 8, 57 P.3d 1248, ¶ 8 (Wyo.2002)). *See Davis v. State*, 910 P.2d 555, 558 (Wyo.1996); and *Smith v. Throckmartin*, 893 P.2d 712, 714 (Wyo.1995).

[¶ 9] Where summary judgment has been granted, this Court will review a grant of summary judgment deciding a question of law *de novo* and uphold the trial court's decision "on the basis of any proper legal theory appearing in the record." *Bitker v. First National Bank in Evanston*, 2004 WY 114, ¶ 8, 98 P.3d 853, ¶ 8 (Wyo.2004) (citations omitted).

## DISCUSSION

[¶ 10] The parties agree there are no genuine issues of material fact: Staley incorrectly advised Knori as to the Office's ability to seek reimbursement by making a claim against Pansy's estate after her death. That said, Knori urges the application of the doctrine of equitable estoppel, which has the effect of precluding an individual from asserting his rights against another person who relied, to his detriment, on the voluntary conduct of the former. *See DeWitt v. Balben*, 718 P.2d 854, 861–62 (Wyo.1986). As traditionally viewed, equitable estoppel is embodied by the following concept:

[O]ne who by his acts or representations intentionally or through culpable negligence induces another to believe certain facts to exist, and the latter, not knowing the facts, acts on such belief to his substantial prejudice, the former is, in equity, estopped to deny the existence of such fact.

*Department of Family Services v. Peterson*, 957 P.2d 1307, 1311 (quoting *Seaman v. Big Horn Canal Association*, 29 Wyo. 391, 398, 218 P. 938 (1923)). In its current form, equitable estoppel requires "some misrepresentation and is generally applied to prevent fraud, either constructive or actual." *Id.* at 1311–12 (citations omitted).

**[¶ 11]** With respect to governmental agencies functioning in their governmental capacities, the standard for equitable estoppel is higher, requiring "even more egregious conduct." *Peterson*, 957 P.2d at 1312.[1] Namely, for equitable estoppel to operate against the government, the movant must demonstrate that the inducement was made by "authorized affirmative misconduct." In addition to the "authorized affirmative misconduct" requirement, equitable estoppel is applied against the government only in rare and unusual circumstances, where its application would not serve to defeat public policy. *See Big Piney Oil & Gas Company v. Wyoming Oil and Gas Conservation Commission*, 715 P.2d 557, 560 (Wyo. 1986). Accordingly, for Knori to succeed under his claim of equitable estoppel against the Office, he must demonstrate: (1) authorized affirmative misconduct; (2) reliance; (3) substantial prejudice; (4) rare and unusual circumstances; and (5) a situation that will not defeat public policy. We find it necessary to address only two: "authorized affirmative misconduct" and "rare and unusual circumstances."

*"Affirmative Misconduct"*

**[¶ 12]** As to the first requirement of invoking the doctrine of equitable estoppel against a governmental agency acting in its governmental capacity, we have previously stated:

In order to invoke the doctrine against a government or public agency functioning in its official capacity, there must be a showing of affirmative misconduct. [Citation omitted.] Affirmative misconduct exists where a person, by his acts, representations, or admissions, intentionally or through culpable negligence induces another to believe that certain facts exist and the other person rightfully relies and acts on such belief and will be prejudiced if the former is permitted to deny the existence of such facts.

*Thompson v. Board of County Commissioners of the County of Sublette*, 2001 WY 108, ¶ 11, 34 P.3d 278, ¶ 11 (Wyo.2001). *See In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 753 P.2d 76, 90 (Wyo.1988), *cert. granted*, 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987, *judgment aff'd*, 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989); *Greub v. Frith*, 717 P.2d 323, 326 (Wyo.1986); and *Big Piney Oil & Gas Company*, 715 P.2d 557. *See also United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); and *Utah Power and Light Company v. United States*, 243 U.S. 389, 405–409, 37 S.Ct. 387, 61 L.Ed. 791 (1917). With more recent decisions, we have made it increasingly clear that "equitable estoppel rarely is applied against a governmental entity and certainly will not lie in the absence of any showing of affirmative misconduct or misrepresentation." *Bell v. Schell*, 2004 WY 153, ¶ 38, 101 P.3d 465, ¶ 38 (Wyo.2004) (and cases cited therein). The reason for the higher standard for equitable estoppel as to the government is premised on the notion that:

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.

*Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). The context and scope of "affirmative misconduct," was thoroughly addressed by an Arizona appellate court, from which we quote at length:

The party attempting to estop the government must first show that the government engaged in wrongful conduct. *See [Freightways, Inc. v. Arizona Corporation Commission*, 129 Ariz. 245, at 248, 630 P.2d 541 at 544, (1981)]. **In cases where the state's actions involved mere negligence or oversight, the courts have re-**

---

1. This standard for the application of equitable estoppel must be distinguished from those situations where the government is acting "as an employer or in a proprietary capacity." *See Wells v. Board of Trustees of Laramie County School District No. 1*, 3 P.3d 861, 867 (Wyo.2000) (recognizing the application of equitable estoppel for "unintentional, misleading statement[s]" when the government is functioning in a proprietary capacity).

fused to apply equitable estoppel. *See Outdoor Systems, Inc. v. Arizona Dept. of Transp.*, 171 Ariz. 263, 830 P.2d 475 (App. 1992) (finding that the state agency's inadvertent issuance of three nonconforming sign permits and failure to notice the error for two years did not amount to wrongful conduct which would give rise to equitable estoppel); *Mohave County v. Mohave-Kingman Estates, Inc.*, 120 Ariz. 417, 586 P.2d 978 (1978) (county's failure to immediately enforce the terms of a land sale contract upon the purchaser's breach did not equitably estop it from later suing the purchaser); *Graham v. Asbury*, 112 Ariz. 184, 540 P.2d 656 (1975) (state was not estopped from seeking overpayment of salary to an employee because more than one year delay in suing was not intentional and did not constitute culpable negligence).

Where equitable estoppel has been applied against the state, the state's action has been more egregious than it was in the instant case. *See [Tucson Electric Power Company v. Arizona Department of Revenue*, 174 Ariz. 507, 851 P.2d 132 (Ariz. App. Div. 1 1992) ] (referring generally to agency's "wrongful" obstructive conduct in arbitrarily refusing to perform obligations imposed upon it by statute); *Freightways*, 129 Ariz. at 245, 630 P.2d at 541 (equitably estopping the agency from denying the validity of a "motor vehicle certificate" where the agency knew of the defect in the filing of the application, approved numerous transfers of the invalid certificate, and waited over fifty years before challenging the certificate's validity).

This prerequisite of "wrongful conduct" when a government is to be estopped is more clearly enunciated as "affirmative misconduct" in federal cases. Since the Department is complying with a federal regulation in seeking reimbursement, it is appropriate to look to how the federal courts apply the doctrine of estoppel against the federal government in similar situations. Federal courts have adopted requirements for the application of estoppel that are similar to those established under Arizona decisional law. They are:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). Compare *Freightways, supra.* To apply estoppel against the United States government, two additional factors must be present. First, **the government must have engaged in some form of "affirmative misconduct."** *See, e.g., Oki v. Immigration and Naturalization Serv.*, 598 F.2d 1160, 1162 (9th Cir.1979). Second, the "injustice caused by the [g]overnment's misconduct [must be] sufficiently severe to outweigh the countervailing interest of the public not to be unduly damaged by the imposition of estoppel." *Beacom v. Equal Employment Opportunity Comm'n*, 500 F.Supp. 428, 435–36 (D.Ariz.1980).

. . . .

In cases in which equitable estoppel has been applied against the federal government, the conduct was egregious. For example, in *United States v. Wharton*, 514 F.2d 406 (9th Cir.1975), the government was estopped from refusing to issue a deed when government officers knew that the long-time occupant of the land was within the time limit for asserting a claim and advised him to the contrary. In *Sun Il Yoo v. Immigration and Naturalization Serv.*, 534 F.2d 1325 (9th Cir.1976), the government's one-year delay of an investigation to correct a mistake in an alien's immigration status estopped the government from deporting the alien when the government had been advised of its mistake and offered no excuse for the delay. [Emphasis added.]

*Carlson v. Arizona Department of Economic Security*, 184 Ariz. 4, 906 P.2d 61, 63–65 (App. Div. 1 1995). Clearly the concept of "affirmative misconduct" as enunciated in *Carlson* is analogous to the standard adopted and applied in Wyoming precedent. *See*

*Thompson,* 34 P.3d 278. Therefore, we must consider whether Staley's act of providing misinformation to Knori rose to the level of "affirmative misconduct" sufficiently egregious to estop the Office from recovering the Medicaid benefits it provided to Pansy.

[¶ 13] The parties agree that Staley, in fact, erroneously and unintentionally miscommunicated facts concerning the Office's ability to seek reimbursement of the Medicaid benefits that Pansy received. However, Knori also concedes:

> It is completely understandable why Hazel Staley was misguided in January of 1995 when she gave incorrect information to Richard Knori. For years Hazel Staley had been advising citizens regarding Medicaid eligibility. Prior to the early 1995 meeting with Richard Knori[,] Hazel had never experienced or heard about post-death estate recovery against the family home. Hazel understood that the finding of "intent to return home" meant the family home was "exempt" from sale in determining eligibility, and since to her knowledge there had been no homes sold to pay back Medicaid after death, it meant exempt forever.

Additionally, Knori recognizes that even the updated version of Chapter 6000 of the Wyoming Public Assistance Manual, a copy of which Staley had at the time of advising Knori, failed to inform Staley or Department field offices of the mandatory estate recovery program contained in § 42–4–206. In fact, Staley's interpretation of Medicaid rules and procedures had been correct until the then-recent adoption of Wyoming's rules necessary to carry out the provisions of OBRA, which were not effective until June 30, 1995. Still, Knori asserts that Staley's conduct rose to the level of affirmative misconduct because she had a "duty ... to give accurate advice to Medicaid Applicants about their eligibility for Medicaid and how it affected their assets, including their family home[s]." To hold government agencies to such a standard would be akin to stating that *any* innocent mistake equates to "culpable negligence" and that employees of such agencies are under a duty never to make mistakes. We cannot agree that the requirement is so broad.

[¶ 14] This conclusion is bolstered by the United States Supreme Court's interpretation of equitable estoppel as against the government in a situation where a non-profit corporation received double reimbursement for certain Medicare expenses, although the non-profit acted in good faith in seeking such reimbursement upon mistaken advice that it had received from a government agent. The court said:

> There is no doubt that respondent will be adversely affected by the Government's recoupment of the funds that it has already spent. It will surely have to curtail its operations and may even be forced to seek relief from its debts through bankruptcy.... Respondent may need an extended period of repayment or other modifications in the recoupment process if it is to continue to operate, but questions concerning the Government's method of enforcing collection are not before us. The question is whether the Government has entirely forfeited its right to the money.
>
> A for-profit corporation could hardly base an estoppel on the fact that the Government wrongfully allowed it the interest-free use of taxpayers' money for a period of two or three years, enabling it to expand its operation. No more can respondent claim any right to expand its services to levels greater than those it would have provided had the error never occurred. Curtailment of operation does not justify an estoppel when—by respondent's own account—the expansion of its operation was achieved through unlawful access to governmental funds. And even if there will be a reduction below the service provided by respondent prior to its receipt of CETA funds, the record does not foreclose the possibility that the aggregate advantages to the community stemming from respondent's use of the money have more than offset the actual hardship associated with now being required to restore these funds. **Respondent cannot raise an estoppel without proving that it will be significantly worse off than if it had never obtained the CETA funds in question.**
>
> ....

As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement. Since it also had elected to receive reimbursement through Travelers, it also was acquainted with the nature of and limitations on the role of a fiscal intermediary. When the question arose concerning respondent's CETA funds, respondent's own action in consulting Travelers demonstrates the necessity for it to have obtained an interpretation of the applicable regulations; respondent indisputably knew that this was a doubtful question not clearly covered by existing policy statements. The fact that Travelers' advice was erroneous is, in itself, insufficient to raise an estoppel, as is the fact that petitioner had not anticipated this problem and made a clear resolution available to respondent. **There is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare; neither can it be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify expenditure of sums of money as substantial as those spent by respondent.** Nor was the advice given under circumstances that should have induced respondent's reliance. As a recipient of public funds well acquainted with the role of a fiscal intermediary, respondent knew Travelers only acted as a conduit; it could not resolve policy questions. The relevant statute, regulations, and Reimbursement Manual, with which respondent should have been and was acquainted, made that perfectly clear. Yet respondent made no attempt to have the question resolved by the Secretary; it was satisfied with the policy judgment of a mere conduit. [Emphasis added; footnotes omitted.]

*Heckler*, 467 U.S. at 62–65, 104 S.Ct. 2218.

[¶ 15]   Knori will, no doubt, suffer adverse consequences from reimbursing the Office for the $259,446.38 of benefits Pansy received. There also is no doubt that Pansy received substantial benefits from the receipt of such Medicaid funds. Knori has not demonstrated that Pansy was any "worse off" from Staley's mistaken advice than she otherwise would have been due to the expenditure of personal funds for medical and nursing care.

[¶ 16]   Additionally, Staley's misinformation does not rise to the level of affirmative misconduct: She did not "know the facts," and her well-intentioned but incorrect information simply did not rise to the "egregious" level required to estop the government. Staley's error was neither intentional nor intended to deceive Knori. Instead, her advice was based upon outdated information, given the recent changes to Medicaid reimbursement rules in Wyoming.[2]

[¶ 17]   Furthermore, as stated in *Heckler*, Knori was expected to know the law and could not act blindly on Staley's advice contrary to the law. On a final note, we agree with the United States Supreme Court in holding that the government cannot guarantee the reliability every bit of "informal advice" given by its agents. 467 U.S. at 64–65, 104 S.Ct. 2218. For these reasons, Knori has not demonstrated that Staley's advice was sufficient to estop the Office from seeking Medicaid reimbursement.

*Rare and Unusual Circumstances*

[¶ 18]   Second, despite the dispositive nature of our earlier discussion, we feel inclined to address the requirement that equitable estoppel be applied against a government agency only in rare and unusual circumstances.

[¶ 19]   Knori argues that the situation he presents must be "rare and unusual" given the lack of Wyoming precedent on this issue. He further argues that this case is unique given that Staley's advice to Knori was "simply wrong" and that there could be only a few still-surviving Medicaid recipients who received this incorrect information. Accordingly, Knori argues that any other outstanding claims of equitable estoppel against the

---

**2.**  Given our conclusion that Staley's error was not "affirmative misconduct," we need not address, as the Office urges us to, whether Staley's acts were authorized.

Office are unlikely, and we should seize this opportunity to apply the doctrine of equitable estoppel. We disagree. There is nothing in the record that would indicate that the circumstances presented by Knori are "rare and unusual" as required for the application of equitable estoppel against the government acting in its governmental capacity. *See Appleby v. State ex rel. Wyoming Workers' Safety and Compensation Division,* 2002 WY 84, ¶ 28, 47 P.3d 613, ¶ 28 (Wyo.2002); and *Bauer v. State ex rel. Wyoming Worker's Compensation Division,* 695 P.2d 1048 (Wyo. 1985).

[¶ 20] The Office seeks reimbursement from numerous individuals and estates every year and, most likely, will continue to do so. And, while not limited to Medicaid benefits, government employees do, on occasion, make mistakes. *See generally* Jean F. Rydstrom, LL.B., Annotation, *Modern Status of Applicability of Doctrine of Estoppel Against Federal Government and Its Agencies,* 27 A.L.R. Fed. 702 § 14 (1976 and 2004 Supp.) (discussing cases in which courts have held that the government was not estopped by misleading or erroneous advice furnished by government agents to claimants for Social Security, retirement pay for federal officers and employees, and similar government benefits). We are presented no reason to conclude here that the mistake in this case was either rare or unusual.

[¶ 21] Because Staley's mistake did not rise to the level of "affirmative misconduct" and because Knori failed to demonstrate that this case presented those "rare and unusual" circumstances justifying an application of the doctrine of equitable estoppel, we conclude that the District Court did not err in granting summary judgment.

[¶ 22] Affirmed.